MORRIS KRUMHORN AND ADRIAN KRUMHORN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4397–90.          Filed July 19, 1994.

*Robert J. Paley* and *Peter C. Woodford,* for petitioners.

---

*George B. Collins,* for petitioner Adrian Krumhorn.

*Alan M. Jacobson* and *Jan E. Lamartine,* for respondent.

RUWE, *Judge:* Respondent determined deficiencies in petitioners' 1978 and 1979 Federal income taxes in the respective amounts of $2,801,888 and $186,585, plus an addition to tax for the taxable year 1978 in the amount of $140,094, pursuant to section 6653(a).[1]

After concessions, the issues for decision are: (1) Whether petitioners properly deducted capital losses from purported commodities transactions on their 1978 joint Federal income tax return, and (2) whether petitioners are liable for the addition to tax as determined by respondent.[2]

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.[3] At the time of filing their petition, petitioner Morris Krumhorn resided in Lake Forest, Illinois, and petitioner Adrian Krumhorn resided in Highland Park, Illinois.[4]

### 1. *Professional Commodities Trader*

During the years at issue, petitioner was a professional commodities trader on the Chicago Mercantile Exchange

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, with the exception of sec. 108, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] In their petition, petitioner Adrian Krumhorn argues that she is entitled to relief as an innocent spouse. By order dated Nov. 23, 1992, we granted the parties' joint motion to sever and to continue innocent spouse issue. Therefore, this issue is not before us here.

[3] In the stipulation of facts, respondent objected to the admission of petitioners' exhibits. Petitioners' exhibits are composed of certain documents that the parties have stipulated were sent to Mr. Krumhorn from Commodities & Finance Co., Ltd. (Comfin), a London broker; documents relating to commodities transactions entered into by Mr. Krumhorn on domestic exchanges; and the deposition of Mr. Martin Emery, an employee of Comfin. Respondent's objections were noted at trial, and the parties agreed to present their respective arguments on brief. We have reviewed the parties' arguments and overrule respondent's objections.

The records in question were the business records of petitioner. See Fed. R. Evid. 803(6). Petitioner testified that he kept notes of the orders he placed with Comfin, and that when he received documentation of these orders from Comfin, he checked that documentation with his notes. If the notes corresponded with the documents from Comfin, he stated that he discarded his notes and retained the Comfin documents as his trading documents. Such documents fall within the business records exception of Fed. R. Evid. 803(6). See *United States v. Childs,* 5 F.3d 1328, 1332–1334 (9th Cir. 1993); *United States v. Doe,* 960 F.2d 221, 222–223 (1st Cir. 1992); *United States v. Jakobetz,* 955 F.2d 786 (2d Cir. 1992).

[4] Unless otherwise noted, references to petitioner in the singular will refer only to Morris Krumhorn.

(CME). Petitioner began his commodities career as a runner on the CME. Petitioner purchased a seat on the CME and began trading for his own account in 1970. Petitioner formed K&S Commodities, Inc., which was a commodities brokerage and trading corporation. "K" stood for "Krumhorn" and "S" stood for "Schiller". During the years 1978 and 1979, petitioner was a 50-percent shareholder and served as president of K&S Commodities, Inc.

A commodities futures contract requires the buyer to receive and the seller to deliver a specified quantity of a given commodity at some future date. The buyer's position is referred to as a "long" position whereas the seller's position is referred to as a "short" position. Every futures position is matched by an exact opposite position. Thus, a price movement creating a gain or loss in one position produces a contrary result in the opposite position. A long position increases in value during a time of rising prices. When prices are rising, the trader's right to purchase the commodity for a lower price becomes more valuable. The reverse is true for short positions. When prices are declining, a contract right to sell the commodity at a higher price becomes more valuable.

A single position (holding either a long or short position) is described as an "open contract" or (in petitioner's vernacular) as "being naked". A straddle consists of the simultaneous holding of a long position (a purchased contract) of a commodity for delivery in a future month and a short position (a sold contract) for the identical amount of the same commodity for delivery in a different future month. These positions are referred to as the legs of the straddle.

The legs of a straddle may be entered into simultaneously or established by separately executing the legs at different times. When the holder of a straddle liquidates (i.e., closes out) one leg of the straddle, the other leg becomes an open contract. A "switch transaction" occurs when the holder of a straddle liquidates one leg of the straddle and replaces the liquidated leg with an identical quantity of the same commodity for delivery in a different month, thereby maintaining the straddle position.

The potential for profit from a straddle arises from changes in the price differential between the legs of the straddle. A trader is exposed to greater risk, and concomitantly greater profit potential, when the trader holds an open position, as

opposed to a straddle, because, due to market forces, the price of the commodity inevitably rises or declines. A trader is exposed to less risk, and thereby less profit potential, if the trader enters into straddle transactions. The reason for this is that as the value of one leg of the straddle decreases, the value of the other increases.

Actual delivery of the underlying commodity rarely occurs. The holder of a futures contract usually avoids delivery by purchasing or selling an offsetting futures contract.

In addition to his domestic commodities trading, petitioner purportedly entered into commodities futures transactions in London with the following brokers: Competex, S.A. (Competex), beginning 1976 through 1977; Comfin,[5] beginning 1978 through 1980; and Southern Commodities, Ltd. (Southern), beginning 1980 through 1982. Petitioner could have entered into similar commodities transactions in New York.

During the 1978 taxable year, petitioner's purported trades with Comfin were solely straddle transactions. Petitioners reported on their 1978 joint Federal income tax return losses of $4,168,844 from commodities transactions with Comfin,[6] long-term capital gains of $2,485,476 from closing commodities transactions originally initiated with Competex during 1976 and 1977,[7] and short-term capital gains of $1,901,344 from domestic trading. As a result, petitioners reported in 1978 net capital gains from all trading of $217,976.

## 2. *Competex*

Competex has been the subject of previous commodities straddle cases.[8] In each of these cases, the transactions

---

[5] In 1985, Comfin's name was changed to Sucden (UK), Ltd.

[6] In 1979 and 1980, petitioners reported on their joint Federal income tax returns total capital gains of $4,228,212 from commodities transactions entered into with Comfin.

[7] In 1976 and 1977, petitioners deducted on their joint Federal income tax returns total losses of $2,456,813.50 from purported commodities transactions entered into with Competex.

[8] See *Cook v. Commissioner,* 941 F.2d 734 (9th Cir. 1991), affg. 90 T.C. 975 (1988); *Keats v. United States,* 865 F.2d 86 (6th Cir. 1988); *Johnson v. Commissioner,* T.C. Memo. 1992–369; *Thurner v. Commissioner,* T.C. Memo. 1990–529; see also *Glass v. Commissioner,* 87 T.C. 1087 (1986), affd. sub nom. *Bohrer v. Commissioner,* 945 F.2d 344 (10th Cir. 1991), affd. sub nom. *Lee v. Commissioner,* 897 F.2d 915 (8th Cir. 1989), affd. sub nom. *Kielmar v. Commissioner,* 884 F.2d 959 (7th Cir. 1989), affd. sub nom. *Dewees v. Commissioner,* 870 F.2d 21 (1st Cir. 1989), affd. sub nom. *Keane v. Commissioner,* 865 F.2d 1088 (9th Cir. 1989), affd. sub nom. *Ratliff v. Commissioner,* 865 F.2d 97 (6th Cir. 1989), affd. sub nom. *Killingsworth v. Commissioner,* 864 F.2d 1214 (5th Cir. 1989), affd. sub nom. *Kirchman v. Commissioner,* 862 F.2d 1486 (11th Cir. 1989), affd. sub nom. *Friedman v. Commissioner,* 869 F.2d 785 (4th Cir. 1989), affd. sub nom. *Yosha v. Commissioner,* 861 F.2d 494 (7th Cir. 1988), affd. sub nom. *Herrington v. Commis-*

entered into by the taxpayers and brokered by Competex were found to be either factual or economic shams. In 1976 and 1977, petitioner entered into purported commodities transactions with Competex. At issue before us, however, are claimed losses from petitioner's purported commodities trades with Comfin.[9]

### 3. *Comfin*

During all relevant years, Comfin[10] was a futures broker specializing in sugar, cocoa, and coffee. Comfin would also trade other commodities or financial contracts if required by a client. Comfin was a member of several London exchanges.

Comfin had its own traders on the floors of the London cocoa, sugar, and coffee exchanges. The trading practices of these exchanges were subject to certain rules and regulations.[11] These exchanges were members of International Commodity Clearing House (ICCH). The ICCH is a clearinghouse for London exchanges and brokerage firms.

Comfin was a member of the ICCH. The ICCH offered computer services to its members. During all relevant years, Comfin utilized the ICCH's computer services for processing records relating to its "futures administration".[12]

Documents prepared by the ICCH for Comfin consisted of (1) computerized lists of trades executed in Comfin's name;

---

sioner, 854 F.2d 755 (5th Cir. 1988).

[9] In petitioners' trial memorandum, they argued:

If the losses from foreign commodity straddle transactions are disallowed in 1978, any gains from such transactions otherwise includable in income in 1978 must also be disregarded in determining the taxable income of a taxpayer.

These reported gains are linked to straddle losses deducted in prior years. At trial, petitioners' counsel stated that petitioners were not waiving this issue, but that it might be raised on brief. Petitioners did not raise this issue on brief. Accordingly, we hold that petitioners have abandoned this issue. See, e.g., *Bradley v. Commissioner*, 100 T.C. 367, 370 (1993); *Leahy v. Commissioner*, 87 T.C. 56, 73–74 (1986).

[10] Our findings of fact regarding Comfin were taken from the deposition of Martin Emery. Mr. Emery did not purport to have personal knowledge of any specific trades that petitioner placed through Comfin. Mr. Emery's testimony therefore is only representative of Comfin's practices in general. Mr. Emery has been employed by Comfin since 1973. At the time of trial, Mr. Emery was the joint managing director of Comfin. During the years at issue, Mr. Emery was Comfin's company secretary.

[11] Petitioners contend that the London exchanges and exchanges in the United States were subject to similar rules and regulations. Petitioners failed to introduce evidence explaining what the rules and regulations of the London exchanges were or how they comport with the rules and regulations in the United States.

[12] Comfin utilized the computer services of International Commodity Clearing House, because, during this period of time, there were very few efficient, cost-effective computer systems available.

(2) a monthly document listing any futures positions each Comfin client held as of the last day of the month; and (3) a "final settlement" document prepared when a client closed a position. Upon receiving documents from the ICCH, it was Comfin's practice to verify the information and allocate the documents to the appropriate client based on a client account number.[13]

On the day after a trade, Comfin would mail a confirmation contract to its client. A confirmation contract is a statement confirming what Comfin bought or sold on the client's behalf. Comfin considered this statement to be a contract. Printed on the confirmation contract was a request that the client sign a provided duplicate. It was Comfin's practice to require that the customer sign these contracts. In many cases, if a client did not sign and return these contracts, Comfin would send out chasers to request that the duplicates be signed and returned.

### 4. Petitioner's Trades With Comfin

Petitioner states that he did not rely on any other person's advice when selecting trades. Petitioner did not utilize any market analysis or projections, and he had no special expertise relating to the sugar, cocoa, or coffee industries. Petitioner did not trade in sugar, cocoa, or coffee on any domestic exchange.

The potential for profit from a straddle arises from changes in the price differential between the legs of the straddle. The larger the price differential, the greater the profit or loss potential. Petitioner did not enter into straddle transactions with the expectation that he would make "material profits".

Petitioner acknowledged that a major consideration in entering into a straddle transaction was the potential tax advantage. Petitioner stated in answer to respondent's interrogatories the following:

I was aware of and took advantage of opportunities to defer income or convert short-term gains into long-term gains in connection with my

---

[13] Comfin would only provide ICCH with a client number. Thus, ICCH was unaware of the name of the client. Comfin would type on the document the name and address of the client corresponding to the account number. After Comfin added the name and address of the client to the document, Comfin mailed it to the client.

commodity trading business and I did offset commodity trading gains with losses realized by closing commodity straddle positions.

\* \* \* \* \* \* \*

My commodity futures trading business which I did in London was based on tax benefits that I could realize from claiming losses which could be used to offset profits from my trading business, converting short-term capital gains into long-term capital gains where possible, and the possibility that I might be able to make profits from price changes in various commodities traded in London.

[S]ince commodity straddle trading was part of my overall commodity trading business, and taxes did reduce my economic gain, the possibility of using the specific commodity straddle transaction in order to reduce my tax liability in a taxable year was always a factor in my decision to engage in the straddle transaction.

The reason that I used a specific month was because I believe that the month would provide movement so that I would be able to realize a profit or loss with respect to the commodity futures trades. Certain trades presented long-term capital gain potential where I used a delivery date more than six-months from the date I purchased the commodity futures contract. Generally, I purchased a commodity with a delivery date more than six months following the date of purchase in order to obtain long-term capital gain potential.

There is no evidence that petitioner entered into an account agreement with Comfin. To make trades, petitioner claims to have placed telephone calls to Comfin from either his office at K&S Commodities, Inc., or the trading floor of the CME. Petitioner could not recall the names of Comfin's employees who allegedly took the trade information. Petitioner received confirmation contracts from Comfin. Printed on the confirmation contracts was a request that petitioner sign and return a provided duplicate. Petitioner never signed and returned the confirmation contracts that Comfin sent to him. Petitioner also received monthly statements and final settlement documents from Comfin. Also printed on the monthly statements was a request that petitioner sign and return a provided duplicate. Petitioner never signed and returned any of the monthly statements sent to him by Comfin.

Petitioners reported on their joint Federal income tax returns for the years 1978 through 1980 the following losses and gains from trading through Comfin:

| Date / description | Amount |
|---|---|
| 1978—short-term capital loss | ($4,168,844) |
| 1979—short-term capital gain | 1,852,361 |
| 1979—long-term capital gain | 1,356,796 |
| 1980—short-term capital gain | 949,135 |
| 1980—short-term capital gain | 69,920 |
| Total | 59,368 |

Petitioner was not required to make a margin payment before he began trading on July 24, 1978. Petitioner made his first margin payment of $52,000 to Comfin on September 12, 1978, after he had purportedly closed contracts generating substantial losses. During 1978 through 1980, petitioner paid a total of $78,000 in purported margin payments to Comfin.[14] Comfin made payments of $2,007.63 on or about February 27, 1979, and $1,586.04 on or about April 14, 1980, to petitioner.[15] These were the only exchanges of money between petitioner and Comfin. Thus, the net result of petitioner's purported trading activity through Comfin was a net out-of-pocket cost of $74,406.33.

Respondent disallowed the capital losses of $4,168,844 that petitioners reported on their 1978 joint Federal income tax return and determined an addition to tax of $140,094 pursuant to section 6653(a). Respondent's determinations are presumed correct, and petitioners bear the burden of proving otherwise. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).

---

[14] Petitioner's payments to Comfin, which he claims were margin payments, were as follows:

| Date | Amount |
|---|---|
| Sept. 12, 1978 | $52,000 |
| Apr. 20, 1979 | 10,000 |
| June 9, 1979 | 12,000 |
| Feb. 29, 1980 | 4,000 |
| Total | 78,000 |

[15] In response to respondent's interrogatories, petitioner stated that he "did not receive any payments from Competex, Comfin or Southern since [he] had net trading losses with these three firms." At trial, however, petitioner stated that he received two checks from Comfin. Petitioner explained that he made a mistake in answering the interrogatory.

OPINION

*Issue 1. Losses From Commodities Transactions*

1. *Background*

The case before us is another in a long saga of straddle cases. Prior to 1981, there was much uncertainty regarding the deductibility of tax straddle losses, and there were several congressional attempts at legislative solutions. See *Glass v. Commissioner,* 87 T.C. 1087, 1153–1155 (1986).

In 1981, Congress enacted title V of the Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97–34, 95 Stat. 172, which required identification of straddles and unitary treatment of the disposition of coordinate legs. While this appears to have effectively eliminated much of the utility of straddles for tax avoidance purposes, ERTA was prospective. Thus, the Commissioner continued to pursue adjustments involving pre-ERTA straddle transactions.

Again, Congress reacted by enacting section 108 of the Deficit Reduction Act of 1984, Pub. L. 98–369, 98 Stat. 494, 630–631. The purpose of section 108 was explained as follows:

> The conferees believe it is inappropriate to prolong the uncertainty with respect to the treatment of losses claimed with respect to straddle positions for periods prior to 1981. * * * the conference agreement provides that a loss on the disposition of a position entered into before 1982 will be allowed, except to the extent nonrecognition is required under any applicable provision, if the position is part of a transaction entered into for profit. * * * [H. Rept. 98–861 (1984), 1984–3 C.B. (Vol. 2) 1, 171.]

Notwithstanding the efforts of Congress, the effect of section 108 on the deductibility of losses realized in a straddle transaction was the subject of conflicting court opinions. Compare *Miller v. Commissioner*, 836 F.2d 1274 (10th Cir. 1988), revg. 84 T.C. 827 (1985) with *Wehrly v. United States,* 808 F.2d 1311 (9th Cir. 1986) and *Landreth v. Commissioner,* 845 F.2d 828 (9th Cir. 1988), affg. T.C. Memo. 1986–242, vacated 859 F.2d 643 (9th Cir. 1988).

Therefore, once again Congress reacted by amending section 108 of the Deficit Reduction Act of 1984. See Tax Reform Act of 1986 (TRA), Pub. L. 99–514, sec. 1808(d), 100 Stat.

2085, 2817.[16] Prior to the 1986 amendment, section 108(b) applied to "commodities [dealers] or any person regularly engaged in investing in regulated futures contracts" and provided that any position held "shall be rebuttably presumed to be part of a transaction entered into for profit." The 1986 amendment to section 108 limited section 108(b) to commodities dealers, removed the rebuttable presumption, and provided a per se rule—any loss incurred "shall be treated as a loss incurred in a trade or business". TRA sec. 1808(d), 100 Stat. 2818. The parties stipulated that petitioner during 1976, 1977, 1978, 1979, and 1980, was a professional commodities trader on the CME. Petitioner was a "commodities dealer" for purposes of section 108(b). Respondent does not contend otherwise.

A central issue in the case before us is the application of the per se rule of section 108(b), as amended. Petitioner contends that he is entitled to the per se rule under section 108(b). Petitioner, alternatively, contends that if section 108(b) does not apply, his foreign trading losses are nevertheless deductible pursuant to section 165(c). Respondent argues that petitioners' losses are not deductible pursuant to section 108(b) or section 165(c) because Mr. Krumhorn's purported straddle transactions never occurred (factual sham), or alternatively, they lacked economic substance (economic sham). Respondent also contends that even if we do not find petitioner's trades to be either factual or economic shams, section 108(b) does not apply to straddle transactions entered into on foreign exchanges.

## 2. *Factual Sham*

A fictitious trade, or factual sham, is one in which the alleged transaction never took place. *Lerman v. Commissioner,* 939 F.2d 44, 48 n.6 (3d Cir. 1991), affg. *Fox v. Commissioner,* T.C. Memo. 1988–570; *Glass v. Commissioner,* 87 T.C. at 1172; see also *Brown v. Commissioner,* 85 T.C. 968, 1000 (1985) ("the disputed transactions constituted factual shams which were inspired, designed, and executed * * * for the sole purpose of attempting to achieve tax losses for their investors"), affd. sub nom. *Sochin v. Commissioner,*

---

[16] For convenience, sec. 108 as enacted in 1984 and as amended in 1986 is reproduced in the appendix.

843 F.2d 351 (9th Cir. 1988). Commodities dealers who have entered into fictitious trades are not entitled to the presumption of section 108(b), nor can they deduct the losses pursuant to section 165(c). *Cook v. Commissioner,* 90 T.C. 975, 986 (1988), affd. 941 F.2d 734 (9th Cir. 1991). On brief, petitioners concede that section 108 does not apply to factual shams. For the following reasons, we find that petitioners have not established that the purported transactions actually occurred.

a. *Lack of Business Formalities*

The relationship between petitioner and Comfin lacked common business formalities. See *Johnson v. Commissioner,* T.C. Memo. 1992–369 ("These details are not dispositive in themselves, but in combination with other indicators of phantom trades, they are suggestive of sham."). For example, there is no evidence that petitioner entered into an account agreement with Comfin. Mr. Emery, who was Comfin's secretary during 1978, testified that Comfin did not always require an account agreement from customers in 1978. However, he indicated that Comfin would probably have sent a short letter setting out the commissions, credit line, and margin requirements. There is no evidence that petitioner received such a letter.

Comfin mailed confirmation contracts and monthly statements to petitioner. These contracts and statements bore a notation requesting that petitioner sign and return a provided duplicate. Comfin considered a confirmation statement to be a contract. It was Comfin's practice to require that a customer who made a trade sign these contracts, and Comfin considered it very important that its clients sign and return the confirmation contracts and monthly statements. Notwithstanding Comfin's procedures, petitioner never signed or returned these documents.

The following schedule reflects the results of petitioner's purported trading activity with Comfin:

| Year | (Loss) before commission | Gain before commission | Commission | Total gain/ (loss) |
|------|------|------|------|------|
| 1978 | ($4,127,339) | -0- | ($41,505) | ($4,168,844) |
| 1979 | -0- | $3,295,112 | (85,955) | 3,209,157 |
| 1980 | -0- | 1,066,388 | (47,333) | 1,019,055 |
| Total | (4,127,339) | 4,361,500 | (174,793) | 59,368 |

In view of the amount of money involved, we find it unusual that the essential terms of petitioner's relationship with Comfin were never formalized and that he was never required to confirm his purported trades in accordance with Comfin's normal policy. See *Johnson v. Commissioner, supra.*

b. *Irregularities in Documents*

Respondent argues that there were irregularities in petitioner's trading documents suggestive of a factual sham. In a well-ordered brokerage house, contracts would normally be prepared in the order in which they were traded. The contract numbers would be in ascending order and, in the case of straddle transactions, the contract numbers of the first and second leg would be adjacent. Mr. Emery testified that Comfin's numbering system for contracts would normally be sequential and that contract numbers in a straddle should be adjacent.[17] However, in the documentation of petitioner's purported trades, four contract numbers were each lower than the ones which immediately preceded them chronologically and were therefore not in ascending order. The contract numbers of at least nine contracts corresponding to the second leg of a straddle were not adjacent to the contract number of the first leg, and the same contract number was used for two different trades in two different commodities. The contract numbers of petitioner's purported trades during 1978, 1979, and 1980 were normally five-digit numbers. However, for the months of November and December 1978, and January, November, and December 1979, the contract numbers were four digits. For trades made in October 1979, the contract numbers were three digits.[18] Respondent's

---

[17] Mr. Emery also stated, however, that he could conceive of a situation where preprinted forms from a prior date were improperly intermingled with current forms. While it is plausible that forms could have been intermingled, we are not convinced this explains the irregularities.

[18] On brief, petitioners argue "that Comfin may have been on a fiscal year and began its numbering system anew at the beginning of each fiscal year." However, during Mr. Emery's deposition, petitioners' counsel questioned Mr. Emery on this point as follows:

Q. Okay. Would it have been your normal practice to start numbering things new at the be-

expert, Mr. Cameron, opined that this presented a "hopeless internal control situation" making it impossible to refer back to a trade without a lengthy search and making it easier to backdate trades.[19] We agree.

Petitioners argue that the ICCH prepared petitioner's account statements using an account number assigned specifically to petitioner. Mr. Emery testified that Comfin allocated the documentation received from the ICCH to a respective client based on the account number. Nevertheless, one account statement purportedly prepared by the ICCH for petitioner contained no account number. There is no explanation how Comfin was able to allocate this document to petitioner without an account number.

Notwithstanding the above irregularities, petitioners argue that the trading documents petitioner received from Comfin, including the monthly statements and final settlement documents that were purportedly generated by the ICCH, prove the trades actually occurred. We disagree. While documentation is a factor we consider, it is not determinative. Indeed, the whole purpose for fictitious trades is to generate a "paper trail". Voluminous documentation cannot confer legitimacy upon otherwise spurious and insubstantial activity. See *Johnson v. Commissioner, supra.* In *Yosha v. Commissioner,* 861 F.2d 494, 500 (7th Cir. 1988), affg. *Glass v. Commissioner,* 87 T.C. 1087 (1986), the Court of Appeals for the Seventh Circuit stated that in fictitious transactions the "broker simply scribbles prices in an account book which generate the desired pattern of losses and gains, and the investor

---

ginning of a new fiscal year?

A. No, sir.

Q. No? Okay.

In any event, starting a new numbering system at the beginning of the year would not explain the inconsistencies in the contract numbers. First, Mr. Emery testified that Comfin's fiscal year ended in September. It follows, therefore, that any new numbering system would have begun in October 1978, not November. Furthermore, had the numbering system been changed for fiscal accounting purposes, one would assume that the new numbering system would continue throughout the fiscal year. But, in this case, four-digit numbers were used for November and December 1978 and January 1979; five-digit numbers were used for the next 8 months; and three-digit numbers were used for October 1979.

[19] By backdating trades, a shamming taxpayer can create the appearance of an actual trade by utilizing his knowledge of what had already occurred in the market.

Petitioner offered evidence that Comfin's records were audited by a reputable accounting firm. However, there is insufficient evidence for us to conclude what type of audit was conducted. Additionally, the fact that an accounting firm audited Comfin's records and requested that petitioner confirm the trades does not explain the irregularities in the documentation. Petitioner has not provided this Court with the opinion of the auditors. Perhaps they too concluded that the irregularities are inexplicable.

reports these accordingly." When documentation offered to support a deduction contains irregularities suggestive of a sham, it is incumbent upon a taxpayer to explain the irregularities. Based on the foregoing, we find petitioners have not met this burden.

Petitioners argue that the records that petitioner received from Comfin are Comfin's own business records within the meaning of rule 803(6) of the Federal Rules of Evidence and, therefore, should be accepted to prove that Comfin actually executed petitioner's trades. While we have held that these documents are admissible as petitioner's records (see *supra* note 3), the fact that the documents were received by petitioner from Comfin does not necessarily mean that they are copies of business records kept by Comfin within the meaning of rule 803(6) of the Federal Rules of Evidence. Mr. Emery testified that in the ordinary course of its business, Comfin prepared records like those sent to petitioner. However, he had no direct knowledge of petitioner's transactions and was not in a position to know whether the documents sent to petitioner were reflective of actual trades that Comfin placed on petitioner's behalf. Indeed, Mr. Emery did not say, and we have no evidence establishing, that originals or copies of the specific documents in issue were ever "kept" by Comfin "in the course of its regularly conducted business activity" to record trades that were executed by Comfin. See Fed. R. Evid. 803(6). According to Mr. Emery, any of Comfin's own records that might have reflected trades made by petitioner had been destroyed.

Petitioners' argument that we should accept the documentation that petitioner received from Comfin at face value is similar to the situation in *Burrill v. Commissioner*, 93 T.C. 643 (1989). In *Burrill*, the taxpayer relied on confirmation statements that purportedly proved that certain foreign transactions had occurred. Even though the confirmation statements, if true, supported the taxpayer's position, we refused to rely on them. In *Burrill*, we observed that

When a domestic entity is used to execute a questioned transaction, we ordinarily expect that underlying evidence of the transaction will be available and that either side that wishes to investigate will be free to do so, by subpoena if necessary. Such an expectation may not be appropriate in the case of a foreign entity, especially if the transaction is executed abroad. Thus, it is appropriate to be reluctant to accept the confirmation notices

at their face value in the foreign entity situation and to require appropriate underlying evidence, as we did in *Julien*. [*Id.* at 664–665.[20]]

## c. *Tax-Motivated Trading Patterns*

In *Forseth v. Commissioner,* we held that a remarkable correlation between tax needs and losses obtained was a strong indicator of factual sham. 85 T.C. 127, 149–152 (1985), affd. 845 F.2d 746 (7th Cir. 1988), affd. sub nom. *Enrici v. Commissioner,* 813 F.2d 293 (9th Cir. 1987), affd. sub nom. *Mahoney v. Commissioner,* 808 F.2d 1219 (6th Cir. 1987). The facts before us indicate a remarkable correlation between tax needs and losses. This is shown by the capital gains and "(losses)" petitioners reported on their 1978 Federal income tax return:

|  | *1978* |
|---|---|
| Domestic | $1,901,344 |
| Competex | 2,485,476 |
| Comfin | (4,168,844) |
| Southern | - - - |
| Net capital gain (loss) | 217,976 |

In 1978, every one of the six Comfin straddle legs that petitioner closed resulted in losses.

| Date of closing | Commodity | *(Loss) before* commission | Commission | Total (loss) |
|---|---|---|---|---|
| August 1978 | Coffee | ($628,396) | ($5,448) | ($633,844) |
| August 1978 | Cocoa | (588,598) | (6,237) | (594,835) |
| September 1978 | Cocoa | (1,182,864) | (12,451) | (1,195,315) |
| October 1978 | Coffee | (76,285) | (1,405) | (77,690) |
| November 1978 | Cocoa | (1,516,710) | (12,445) | (1,529,155) |
| December 1978 | Coffee | (134,486) | (3,519) | (138,005) |
| Total | | (4,127,339) | (41,505) | (4,168,844) |

Petitioner admitted that his London trading activity was:

---

[20] In *Julien v. Commissioner,* 82 T.C. 492, 501–502 (1984), we stated:

In Rev. Rul. 80–324, 1980–2 C.B. 340, the Commissioner of Internal Revenue took the position that an investment prospectus, canceled checks, and confirmation statements issued in connection with an investment in futures contracts with a foreign investment firm are insufficient to substantiate the existence of transactions entitling the taxpayer to a loss deduction. In the case under consideration, no foreign investment corporation's records of the taxpayers' transactions could be made available for examination. While the revenue ruling is not, of course, precedential here (*Stubbs, Overbeck & Associates v. United States,* 445 F.2d 1142 (5th Cir. 1971)), we must observe that the paucity of proven facts from overseas in the case before us would fully justify skepticism of the type manifested by the Commissioner in Rev. Rul. 80–324.

based on tax benefits that I could realize from claiming losses which could be used to offset profits from my trading business, converting short-term capital gains into long-term capital gains where possible, and the possibility that I might be able to make profits from price changes in various commodities traded in London.

Petitioner also admitted that he did not expect to make material profits from his straddle transactions.

### d. *Lack of Margins*

Respondent argues that petitioner's margin payments[21] had no correlation to whether petitioner's account with Comfin had a deficit or gain. In other words, the margin payments had no apparent correlation to Comfin's potential risk of loss at the time the payments were made. In *Forseth v. Commissioner,* 85 T.C. at 154, one of the factors that convinced this Court that the transactions were fictitious was that the trading began before the taxpayers had posted any margin deposits. In *Johnson v. Commissioner,* T.C. Memo. 1992–369, we stated that it strained our credulity to believe that a broker would have been willing to risk losing large amounts of money in trades with the taxpayers on the basis of the taxpayers' excellent reputation and the high degree of trust that characterizes the commodities business.

In *Johnson,* contracts generating substantial losses were closed out before any margin payment was made. Similar to *Johnson,* Comfin closed out contracts generating substantial losses before petitioner made his first purported margin payment of $52,000 to Comfin on September 12, 1978.

Petitioner contends that this is explained by Mr. Emery's testimony that Comfin only required margin payments when a trader's losses exceeded unrealized profits coupled with any extended line of credit. Petitioner, however, failed to show the extent to which his losses exceeded unrealized gains, the

---

[21] In *Glass v. Commissioner,* 87 T.C. at 1103, this Court described margin payments as follows:

Initial margin (or initial deposit) is the amount of money which a broker/dealer may require from a customer in order to initiate trading. Margin payments provide insurance to broker/dealers that losses incurred in a customer's account will be met. * * *

$$* \qquad * \qquad * \qquad * \qquad * \qquad * \qquad *$$

Maintenance margin * * * is the amount of funds, if any, that a broker/dealer might require a customer to pay into his account after trading commences. * * *

Broker/dealers periodically value the open positions in a customer's account in order to determine whether the payment of maintenance margin is required. * * *

amount of his credit line, if any existed, or how the margin requirements were calculated vis-a-vis the excess of losses over gains and the credit line.

### e. *Zeroing Out of Account Balances*

In *Forseth v. Commissioner,* 85 T.C. at 158–160, and *Johnson v. Commissioner, supra,* we found that the zeroing out of accounts (where a taxpayer's margin balance is roughly equal to the excess of losses over gains) after making trades over a period of time when there was great volatility in the relevant markets is suggestive of a factual sham. Respondent argues that petitioner's margin balance was roughly equal to the excess of losses over gains. In response, petitioners argue the following:

When a customer finalizes his last trade with a brokerage firm, he should zero out his account. Anything else, and it could arguably be a payment for tax losses. Thus, the fact that Krumhorn departed from Comfin with every cent he was entitled to and no more, illustrates that his relationship with Comfin was at arm's length. Respondent's reading of case law to the contrary is simply incorrect and lacks common sense.

In *Forseth* and *Johnson,* we were concerned with more than the mere closing of an account. In the case before us, after 3 years of trading through Comfin involving numerous trades and millions of dollars, the only payments petitioner ever made to Comfin were the purported margin payments of $78,000. When his account with Comfin was closed, petitioner's account was remarkably close to zero. The only payments Comfin ever made to petitioner consisted of a check for $2,007.63 executed on or about February 27, 1979, and a check for $1,586.04 executed on or about April 14, 1980.

Petitioner did not reconcile his account. Even though petitioner made purported margin payments of $78,000 and reported substantial gains and losses from his straddle transactions, he did not explain when or how all his gains and losses were credited to his account or what impact exchange rates had on his account. Notwithstanding the voluminous trading documents submitted by petitioners to this Court, the documentation relating to petitioner's account is incomplete.

## f. *Conclusion*

Given the lack of business formalities, the irregularities in the documentation of the purported trades, the correlation of losses and gains with tax needs, the lack of margin payments, and the zeroing out of account balances, we sustain respondent's determination. Petitioners have not carried their burden to overcome respondent's determination that petitioner's trades with Comfin were factual shams. Rule 142(a).

## 3. *Economic Sham*

Respondent contends that even if petitioner's straddle transactions actually occurred, they lacked economic substance, and therefore section 108(b) and section 165(c) do not apply. Petitioners contend that section 108(b) applies to commodities dealers, even if the straddle transactions lack economic substance. Petitioners alternatively contend that Mr. Krumhorn's straddle transactions did not lack economic substance.

Economic shams or transactions lacking economic substance are transactions that have actually taken place, but which have no economic significance beyond expected tax benefits. *Sheldon v. Commissioner*, 94 T.C. 738, 759 (1990). The substance-over-form doctrine was pronounced in *Gregory v. Helvering,* 293 U.S. 465, 469 (1935) ("the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended."). In *Helvering v. Gregory,* 69 F.2d 809, 811 (2d Cir. 1934), affd. 293 U.S. 465 (1935), Judge Learned Hand characterized the doctrine as follows:

All these steps were real, and their only defect was that they were not what the statute means * * * because the transactions were no part of the conduct of the business of either or both companies; so viewed they were a sham, though all the proceedings had their usual effect. * * *

In *Cook v. Commissioner,* 90 T.C. 975 (1988) (Court reviewed), affd. 941 F.2d 734 (9th Cir. 1991), we held that section 108(b) was not intended to provide a safe haven for commodities dealers that engaged in transactions void of economic substance.[22] Specifically, we stated "that it is appro-

---

[22] The taxpayer in *Cook* filed a motion for reconsideration of our findings and opinion in *Glass*

priate before applying the per se rule of section 108(b) to enquire whether straddle transactions were fictitious, prearranged, or otherwise in violation of the rules of the exchange, and if so, whether there were losses actually incurred." *Id.* at 986. In *Cook,* we reasoned that section 108(b) does not apply to commodities dealers that have entered into straddle transactions lacking in economic substance because, "In effect, then, no losses were incurred." See *id.* at 985, 986 n.6. "Since the straddle transactions in *Glass* were prearranged, causing the transactions to lack economic substance, [taxpayer] incurred no losses to which the per se rule can be applied." *Id.* at 986.

The Court of Appeals for the Ninth Circuit in *Cook v. Commissioner, supra,* summarized our decision in *Cook* as follows:

the Tax Court held that even though a commodities dealer did not need to satisfy the "for profit" requirement under the 1986 Act, he still needed a "loss". * * * [941 F.2d at 737].

## The Court of Appeals for the Ninth Circuit reasoned:

Once Congress amended section 108 in 1986 to make the language on commodities straddles track the traditional section 165 language, it eliminated the need to construe section 108 in a fashion distinct from section 165. * * *

* * * * * * *

In an economic sham transaction, there is no recognizable loss in section 165, so there is none under the parallel language in section 108. [*Id.* at 738.]

* * * * * * *

We construe the word "loss" in section 108 in accord with the ordinary English meaning of the word, its structural parallel in section 165 of the Code, and the 55 year old *Gregory* tradition. * * * [*Id.*]

---

*v. Commissioner,* 87 T.C. 1087 (1986), which we granted. *Cook v. Commissioner,* 90 T.C. at 975–976. In *Glass v. Commissioner, supra* at 1167, we stated our understanding from the record that "The case before us does not involve commodities dealers." Thus, in *Glass,* sec. 108(b) was not at issue. The taxpayer in *Cook* amended his petition alleging that he was a commodities dealer. *Cook v. Commissioner, supra* at 976. The Commissioner admitted that the taxpayer was a commodities dealer. *Id.* In *Cook,* after recognizing that our statement in *Glass* was inaccurate, we addressed the issue of whether the per se rule under sec. 108(b) was available to the taxpayer for losses claimed from London options transactions, which we determined in *Glass* lacked economic substance. *Id.* at 976–977.

In *Glass v. Commissioner,* 87 T.C. at 1166, this Court also noted the parallel between amended section 108 and section 165:

The amended section 108(a) expressly distinguishes between a loss incurred by a commodities dealer in the trade or business of trading commodities and a loss incurred in a commodities transaction entered into for profit though not connected with a trade or business. Thus, the language of section 108(a) is now completely harmonized with that of section 165(c)(1), which allows losses incurred in a trade or business, and section 165(c)(2), which allows losses incurred in any transaction entered into for profit, though not connected with a trade or business.

In *Fox v. Commissioner, supra,* we again addressed the issue of whether section 108(b), as amended, applies to a commodities dealer entering into *Glass* type transactions (i.e., straddle transactions lacking in economic substance), T.C. Memo. 1988–570, revd. sub nom. *Horn v. Commissioner,* 968 F.2d 1229, 1232 (D.C. Cir. 1992), affd. sub nom. *Gardner v. Commissioner,* 954 F.2d 836 (2d Cir. 1992), affd. sub nom. *Lerman v. Commissioner,* 939 F.2d 44 (3d Cir. 1991). In *Fox,* we held, based on our decision in *Cook v. Commissioner, supra,* that section 108(b) did not apply to commodities dealers whose straddle transactions were devoid of economic substance.

In affirming our decision in *Fox,* the Court of Appeals for the Third Circuit in *Lerman v. Commissioner,* 939 F.2d at 45, held:

If a transaction is devoid of economic substance * * *, it simply is not recognized for federal taxation purposes, for better or for worse. This denial of recognition means that a sham transaction, devoid of economic substance, cannot be the basis for a deductible "loss." Section 108, then, which allows deductions for *losses* incurred pursuant to straddle transactions, is inapplicable to straddle transactions devoid of economic substance as there is no "loss" to which the presumption provided by section 108 can apply.

A summary of the analysis of the Court of Appeals for the Third Circuit is as follows:

*Per Gregory v. Helvering,* 293 U.S. 465 * * * (1935), it is settled federal tax law that for transactions to be recognized for tax purposes they must have economic substance. Therefore, economic substance is a *prerequisite* to the application of any Code provisions allowing deductions, including section 108. [*Id.* at 52.]

The London option transactions involved lacked economic substance * * *. Thus, * * * they cannot be recognized for tax purposes. Because

they are not recognized for tax purposes, section 108 does not even come into play. Section 108(b) applies to "any loss" deducted under section 108(a), but section 108(a) cannot be applied to transactions lacking in economic substance because, in tax terms, a transaction lacking in economic substance cannot result in a "loss." * * * [*Id.* at 52–53.]

[S]ection 108(b) prevents the Commissioner from disallowing loss deductions by pointing to evidence that any one dealer did not have a profit motive when engaging in a straddle transaction.

We see no basis to hold, however, that the amendment to section 108(b) was intended to override the long-standing requirement that transactions have economic substance to be qualified for loss deduction status. * * * As explained in *Demartino* [*v. Commissioner*, 862 F.2d 400 (2d Cir. 1988)], elimination of a profit motive inquiry does not "prevent the inquiry into the economic substance of a dealer's commodity trading." * * * [*Id.* at 53.]

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

The economic substance doctrine has been consistently applied by the courts for many years in a variety of tax situations. There is no sound reason to conclude that, in enacting the amendments to section 108(b), Congress meant to abandon the doctrine. * * * [*Id.* at 54.]

$$* \quad * \quad * \quad * \quad * \quad * \quad *$$

Since the application of section 108(b) depends on the availability of section 108(a), * * * the overwhelming majority of cases which have found section 108 unavailable to the London option transactions * * * confirm our belief that Congress did not enact section 108(b) as a safe harbor for commodities dealers who engage in transactions devoid of economic substance, prearranged to create losses. * * * [*Id.* at 56; fn. ref. omitted.]

In affirming our decision in *Fox v. Commissioner,* T.C. Memo. 1988–570, the Court of Appeals for the Second Circuit agreed with the analysis of the Third Circuit in *Lerman:*

we * * * agree with the Third Circuit that "[t]here is no sound reason to conclude that, in enacting the amendments to section 108(b), Congress meant to abandon the [economic substance] doctrine." * * * we agree with the Tax Court and the Third Circuit that the straddle transactions did not create any recognizable losses. [*Gardner v. Commissioner,* 954 F.2d 836, 838–839 (2d Cir. 1992).]

The Court of Appeals for the District of Columbia Circuit, however, disagreed with the Courts of Appeals for the Second and Third Circuits and reversed our decision in *Fox v. Commissioner, supra.* See *Horn v. Commissioner,* 968 F.2d at 1235–1240. In *Horn,* the Court of Appeals noted that

Although the result in this case seems straightforward to us, our judgment is offered with some trepidation in light of the contrary conclusions

reached by three sister circuits, the Tax Court and the Commissioner. * * * [*Id.* at 1234.]

In *Horn,* the Court of Appeals held that section 108(b) provides special treatment for commodities dealers; "that special treatment is an *irrebuttable* presumption" that any loss by a commodities dealer from the disposition of a straddle leg is considered to be incurred in a trade or business, and therefore deductible, notwithstanding a lack of economic substance. *Id.*

We disagree with the holding in *Horn* and hold, consistent with our prior cases and all other Courts of Appeals that have reviewed this matter, that section 108(b) does not apply to commodities dealers whose transactions lack economic substance.[23] Therefore, we reiterate our conclusion in *Cook,* that it is appropriate before applying the per se rule of section 108(b) to inquire whether the straddle transactions at issue are devoid of economic substance.

It is well established that losses arising from transactions lacking economic substance are not deductible pursuant to section 165(c). Therefore, if petitioner's trades lacked economic substance, petitioners' losses are not deductible pursuant to either section 108(b) or section 165(c).

We now turn to whether petitioner's transactions with Comfin were devoid of economic substance. For purposes of our analysis of economic substance, we will assume that petitioner's trades actually took place; or in other words, that they were not factual shams.

In *Glass v. Commissioner,* 87 T.C. at 1172, 1176, we stated:

The one consistent thread which runs through all of the cases consolidated in this proceeding is that losses, either ordinary or capital, were intentionally incurred in year one, followed by countervailing gains in year two

---

[23] Venue for appeal of this case lies to the Court of Appeals for the Seventh Circuit; therefore, we are not bound by the decision in *Horn v. Commissioner,* 968 F.2d 1229 (D.C. Cir. 1992), revg. *Fox v. Commissioner,* T.C. Memo. 1988–570, revg. *Kazi v. Commissioner,* T.C. Memo. 1991–37. We "follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone." *Golsen v. Commissioner,* 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). "On the other hand, if appeal from our decision lies to a Court of Appeals that does not have a decision squarely in point, we, as a court of national jurisdiction, must thoroughly reconsider an issue in light of the reasoning of a reversing appellate court and, if still of the opinion that our original result was right, follow our own beliefs until the Supreme Court decides the point." *Peat Oil & Gas Associates v. Commissioner,* 100 T.C. 271, 274 (1993).

or in many instances later as a result of rollovers. [Fn. ref. and citation omitted.]

\* \* \* \* \* \* \*

The intentionally realized losses in year one were not necessary or helpful in profiting from difference gains in [taxpayers'] commodity straddle transactions. Put in this light, the London options strategy was "a mere device which put on the form of [commodity option and futures transactions] as a disguise for concealing its real character," the obtaining of unallowable loss deductions. *As such, the London options transaction lacked economic substance and was a sham.* [Emphasis added; fn. refs. omitted.]

The Court of Appeals for the Third Circuit in *Lerman v. Commissioner,* 939 F.2d at 49, summarized our opinion in *Glass* as follows:

The Tax Court analyzed the entire two-year scheme in detail and concluded that the transactions were "intentional[ly] skew[ed] \* \* \* to realize year one losses \* \* \*." [*Glass v. Commissioner,* 87 T.C.] at 1174. The potential for a profit existed but the taxpayers avoided making a profit by intentionally realizing losses in the first year which "were not necessary or helpful in profiting from difference gains in petitioners' commodity straddle transactions." *Id.* at 1175–76. \* \* \*

See also *Cook v. Commissioner,* 90 T.C. at 982 ("the transactions, nevertheless, lacked economic substance and were a sham because the realization of tax losses in year one of the London options transaction was preordained"); *Fox v. Commissioner,* T.C. Memo. 1988–570 ("after comparing the potential nominal economic gains with the prearranged and 'very substantial' tax losses anticipated in the first year of the straddle, we concluded that the *Glass* transactions lacked economic substance").

It is apparent that the tax centerpiece of petitioner's Comfin commodity straddle transactions was to close positions, which in every case resulted in losses for 1978 (year 1 of the Comfin transactions), and to move the offsetting gain to subsequent years. As shown in the following table, petitioner systematically closed positions in 1978, which, in every case, resulted in losses:

| Date of closing | Commodity | (Loss) before commission | Commission | Total (loss) |
|---|---|---|---|---|
| August 1978 | Coffee | ($628,396) | ($5,448) | ($633,844) |
| August 1978 | Cocoa | (588,598) | (6,237) | (594,835) |
| September 1978 | Cocoa | (1,182,864) | (12,451) | (1,195,315) |
| October 1978 | Coffee | (76,285) | (1,405) | (77,690) |
| November 1978 | Cocoa | (1,516,710) | (12,445) | (1,529,155) |
| December 1978 | Coffee | (134,486) | (3,519) | (138,005) |
| Total | | (4,127,339) | (41,505) | (4,168,844) |

Petitioner's cursory explanations as to why he systematically realized losses in 1978 fail to convince us that the straddle transactions were structured for any reason other than tax losses.[24] Petitioner carried out the second element of his tax scheme by moving the offsetting gains to 1979 and 1980.

---

[24] On direct examination of petitioner, the following exchange occurred:

Q. When you made these trades which created the losses, were you aware of the tax benefits you could achieve by making these trades?
A. Yes.
Q. Why did you decide to make the sales which produced the losses?
A. It was the wrong market. I wanted to get out.
Q. Did you have any—you were aware of the tax benefits?
A. Yes. Right.
Q. So when you wanted to get out, what was the reason that you wanted—you took the loss here in—this looks like in October, for example, * * *
A. I was wrong at the market, and I wanted to preserve my capital.
Q. Good. If you were on—if you had another leg, would you have a potential profit on the other side in this transaction?
A. If I did, yes.

*       *       *       *       *       *       *

Q. * * * When you took a loss on a commodity, was there any economic consideration? When you took a loss was there any—
A. There was tax ramifications.
Q. Right. Were there reasons you would take a loss at a specific time, rather than waiting longer, or taking the loss quicker—if there was a loss—quicker? Was there any reason which led you to do that? Would you consider any economic factors or any other factors when you did this, took this loss?
A. Well, depending. If I was naked and took a loss, I just wanted to get out of the market.
Q. Right. But if you were straddled—in this case in 1978, you were straddled, and you took a loss. Did that minimize any risks by taking the loss at a specific time, or did it make no difference to you?
A. It didn't minimize anything.

*       *       *       *       *       *       *

Q. At the time you took the loss—if you took the loss at a specific date, could the loss have been greater had you waited longer?
A. Possibly.
Q. It could have been reduced?
A. Possibly.
Q. So did you decide, based on that loss, that you had concluded for economic reasons you wanted to take the loss at that time?
A. Yes.

On cross-examination of petitioner, the following exchange occurred:

Q. Now, you earlier—on a question that Mr. Paley asked you, particularly in 1978, I believe you said when you closed some of these lost [sic] legs, that you were trying to get out of a losing

We find that it was petitioner's intent from the very beginning to systematically close straddle legs that, in every case, resulted in losses in year one and to move the offsetting gains to subsequent years. Stated differently, the realization of losses in year one was "preordained". This scheme was not necessary or helpful in making a profit.[25]

Petitioner's generalized contentions that he intended to make a profit and that there was a prospect for such profit is not sufficient. A similar argument was made in *Glass v. Commissioner,* 87 T.C. at 1174, wherein we stated:

[Taxpayers] argue that under the London options transaction, there was a reasonable prospect for a profit. This argument conveniently overlooks the fact that in the critical year—the loss year—there was *no* prospect for *any* profit, for any other result would have destroyed the raison d'etre for entering into the London options transaction in the first place. We reemphasize at this point, however, that the focus of our attention is petitioners' entire tax straddle scheme, and not each separate straddle. It is the overall scheme which taints the deductibility of the year one losses. [Citations omitted.]

Similarly, since we believe petitioner's year 1 losses were planned, there was no prospect for profit in that year. As to the entire straddle scheme, petitioner admitted that he did not expect to make material profits from his straddle trans-

---

position. Is that right?

A. Sometimes.

Q. But isn't it also true that when you did this, you got right back into this position? You were doing day trades, switches?

A. Yes, that could be.

Q. That is correct. Isn't it?

A. Not 100 percent. But I will take your word for it, if that is what you are saying.

Q. Well, will you show me an instance in 1978 when you closed a loss leg that you did not get back into that position?

A. The same day? That is what you just said.

Q. Yes, sir.

A. I don't know where to find them.

Q. So as far as you know, you always—you closed out a position and you got right back in to have a straddle. Is that right?

A. Yes.

[25] In *Glass v. Commissioner, supra* at 1174, we stated:

There can be no real dispute that the tax centerpiece of the London options transaction was the closing of the sold option in year one with an ordinary loss objective and the moving of the offsetting capital gain to a subsequent year. The London option trades were consciously effected with this in mind. Petitioners no doubt realize that, given the complexity of trading in commodity options and futures and the relatively high cost of commissions, profiting from difference gains in amounts sizable enough to make the enterprise worthwhile is a difficult and hazardous undertaking at best. It follows logically, then, that the intentional skewing of the transactions to realize year one losses introduces an additional negative element which prohibitively stacks the deck against the chances of significant financial success.

actions.[26] Therefore, petitioner's systematic realization of losses in year 1 was not necessary or helpful in making a profit; indeed, it may have "prohibitively [stacked] the deck against the chances of significant financial success." See *Glass v. Commissioner, supra* at 1174. We find that petitioner's transactions lacked economic substance.

Petitioners contend that Mr. "Krumhorn reported an actual profit in dollars from his trades with Comfin which negates any inference of economic sham." Petitioners reported on their 1978, 1979, and 1980 Federal income tax returns a net gain of $59,368 from Mr. Krumhorn's straddle transactions with Comfin. These same transactions, however, which purportedly generated net gain in U.S. dollars, generated a loss of £52,185 in British pounds.[27] Moreover, petitioner paid Comfin a total of $78,000 in margin payments and received only two checks from Comfin, which totaled approximately $3,594, resulting in a net negative cash-flow or "loss" position of $74,406. Petitioners have not adequately explained this discrepancy.[28] Therefore, while petitioner reported a net gain

---

[26] For example, in petitioner's answers to respondent's interrogatories, see *supra* pp. 34–35, he stated that he did not enter into straddle transactions to make material profits, that he did not make material profits, and that one purpose for entering into commodities transactions in London was to offset the tax consequences derived from his domestic trading. Furthermore, petitioner's only stated purpose for entering into these transactions in London, as opposed to New York, was that he preferred the service in London.

[27] Based on the exhibits submitted by petitioners, Mr. Krumhorn's trades with Comfin during 1978 through 1980 produced the following results:

| Year | (Loss) before commission | Gain before commission | Commission | Total gain/(loss) |
|---|---|---|---|---|
| 1978 | [1](2,117,875) | -0- | (21,250) | (2,139,125) |
| 1979 | -0- | 1,669,063 | (41,910) | 1,627,153 |
| 1980 | -0- | 481,187 | (21,400) | 459,787 |
| Total | (2,117,875) | 2,150,250 | (84,560) | (52,185) |

[1] All figures in this table are stated in British pounds (£).

[28] At trial, on cross-examination of petitioner, the following exchange occurred:

Q. Mr. Krumhorn, when you traded on the Chicago Mercantile Exchange, did you always receive the gains that you made on your trading?

A. Excuse me?

Q. When you made money on the Chicago Mercantile Exchange, you always received the income, the net income that you made. Isn't that right?

A. Yes, sir.

Q. Do you think it is strange in this case, that after you got through trading with ComFin after three years—you had a net profit of approximately $60,000—you never got that money from them?

A. I think it might have been an error.

Q. On whose part?

A. It could have been on mine, an oversight.

Q. You would just forget about $60,000?

A. No. But I say it was an error. I mean, I don't know. I mean—God—at that time, my mind was in another world. I had marital problems.

of $59,368, this does not reflect the true economic substance of petitioner's straddle transactions.

In any event, the fact that the entire transaction produces a nominal net gain will not impute substance into an otherwise sham transaction. See *Fox v. Commissioner,* T.C. Memo. 1988–570. In *Fox,* we stated:

On the contrary, we specifically observed in *Glass* that a "very small" net economic gain might result from the closed straddle transaction (87 T.C. at 1157). However, after comparing the potential nominal economic gains with the prearranged and "very substantial" tax losses anticipated in the first year of the straddle, we concluded that the *Glass* transactions lacked economic substance. [*Id.*]

---

Q. Well, what about—you paid in $78,000 in so-called margin payments to ComFin during the period—

A. Yes.

Q. —and you never got that back either. Isn't that a little strange?

A. Why? They say—I thought one of the letters say that they used it to pay one of the losses.

Q. Yes. But over—

A. I think that was explanatory in there.

Q. But overall, you have net gains so that they wouldn't have to use your margin payments.

A. Well, it might have been commissions eating it up.

Q. Didn't they take out the commissions on each separate trade and charge that against each trade?

A. There is also—there might have been a dollar valuation from the pounds. Your dollar is worth less; your dollar is worth more. Currencies fluctuate. And they could have gone that way, too.

Q. But you don't know?

A. I don't—I mean, I just don't know.

Q. You never asked them where the money was, in other words?

A. No. This is probably my fault.

On re-direct, petitioner's counsel elicited responses from petitioner in an attempt to clarify some of the above statements. In essence, petitioner stated that currency fluctuations explain why he reported a gain in U.S. dollars when he had a loss in English pounds. Even if we assume petitioner's explanation is plausible, the remainder of the exchange on re-direct strongly implies that petitioner had an actual overall loss in U.S. dollars:

Q. Okay. So that that would account for the fact that when you reported a gain for income tax purposes on your federal income tax returns, you may have actually had a loss because of currency fluctuations.

A. Fluctuation. No one took in account that.

Q. Did you report any loss from currency valuations on your tax return?

A. Not that I know of.

Q. And who would have had to report that loss for you?

A. Richard Bezark, the accountant.

Q. Your accountant. So he did not take any such loss?

A. No.

Q. But that would account for the fact that you did not receive virtually any money back for—with respect to your taxable profits for US income tax purposes—

A. Yes, sir.

Q. —in connection with these trades with ComFin * * *

We hold that petitioner's straddle transactions lacked economic substance. Therefore, petitioners' losses are not deductible under section 108(b) or section 165(c).[29]

## Issue 2. Addition to Tax

The final issue for decision is whether petitioners are liable for an addition to tax under section 6653(a) for 1978 as determined by respondent. Section 6653(a) provides that if any part of any underpayment is due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal to 5 percent of the underpayment. Negligence is a lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. *Freytag v. Commissioner,* 89 T.C. 849, 887 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Petitioners bear the burden of proving that their actions in claiming these losses were not negligent. Rule 142(a); *Forseth v. Commissioner,* 85 T.C. 127, 166 (1985), affd. 845 F.2d 746 (7th Cir. 1988), affd. sub nom. *Enrici v. Commissioner,* 813 F.2d 293 (9th Cir. 1987), affd. sub nom. *Mahoney v. Commissioner,* 808 F.2d 1219 (6th Cir. 1987).

Petitioner did not enter into an account agreement with Comfin, he did not sign any of the contracts as requested and normally required by Comfin, he did not produce complete documentation regarding his account with Comfin, and he failed to explain adequately why he reported a gain from his transactions with Comfin on his Federal income tax returns when, in fact, he appears to have lost $74,406.33. Petitioner systematically produced losses in 1978 from his dealings with Comfin in order to offset his income from domestic trades and then moved the corresponding Comfin gains to subsequent years. In light of these factors and our finding that petitioners failed to prove that the trades actually occurred, we find that petitioners have failed to prove that they were not negligent.

In addition, respondent's negligence determination was attributable to the entire deficiency. Petitioners conceded issues unrelated to Mr. Krumhorn's straddle transactions with Comfin. Petitioners did not offer any evidence to show

---

[29] Having so held, we need not address respondent's final argument.

that they were not negligent with respect to the conceded issues, nor did they argue on brief that they were not negligent as to the issues they conceded. We, therefore, sustain respondent's determination.

> *An appropriate order will be issued restoring this case to the general docket for trial or other disposition.*

---

## APPENDIX

Deficit Reduction Act of 1984,
Pub. L. 98–369, 98 Stat. 494, 630–631
(Section 108)

SEC. 108. TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BEFORE EFFECTIVE DATE OF ECONOMIC RECOVERY TAX ACT OF 1981.

(a) General Rule.—For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions—

(1) which were entered into before 1982 and form part of a straddle, and

(2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply,

any loss from such disposition shall be allowed for the taxable year of the disposition if such position is part of a transaction entered into for profit.

(b) Presumption That Transaction Entered Into for Profit.—For purposes of subsection (a), any position held by a commodities dealer or any person regularly engaged in investing in regulated futures contracts shall be rebuttably presumed to be part of a transaction entered into for profit.

(c) Net Loss Allowed Whether or Not Transaction Entered Into for Profit.—If any loss with respect to a position described in paragraphs (1) and (2) of subsection (a) is not allowable as a deduction (after applying subsections (a) and (b)), such loss shall be allowed in determining the gain or loss from dispositions of other positions in the straddle to the extent required to accurately reflect the taxpayer's net gain or loss from all positions in such straddle.

(d) Other Rules.—Except as otherwise provided in subsections (a) and (c) and in sections 1233 and 1234 of such Code, the determination of whether there is recognized gain or loss with respect to a position, and the amount and timing of such gain or loss, and the treatment of such gain or loss as long-term or short-term shall be made without regard to whether such position constitutes part of a straddle.

(e) Straddle.—For purposes of this section, the term "straddle" has the meaning given to such term by section 1092(c) of the Internal Revenue Code of 1954 as in effect on the day after the date of the enactment of the

58

Economic Recovery Tax Act of 1981, and shall include a straddle all the positions of which are regulated futures contracts.

(f) Commodities Dealer.—For purposes of this section, the term "commodities dealer" has the meaning given to such term by section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle).

(g) Regulated Futures Contracts.—For purposes of this section, the term "regulated futures contracts" has the meaning given to such term by section 1256(b) of the Internal Revenue Code of 1954 (as in effect before the date of enactment of this Act).

(h) Syndicates.—Subsection (b) shall not apply to any syndicate (as defined in section 1256(e)(3)(B) of the Internal Revenue Code of 1954).

Tax Reform Act of 1986,
Pub. L. 99–514, 100 Stat. 2085, 2817–2818
(Section 1808(d))

(d) Section 108.—Section 108 of the Tax Reform Act of 1984 is amended—

(1) by striking out "if such position is part of a transaction entered into for profit" and inserting in lieu thereof "if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business",

(2) by striking out subsection (b) and inserting in lieu thereof the following:

"(b) Loss Incurred in a Trade or Business.—For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.",

(3) by striking out the heading for subsection (c) and inserting in lieu thereof the following:

"(c) Net Loss Allowed.—",

(4) by striking out subsection (f) and inserting in lieu thereof the following:

"(f) Commodities Dealer.—For purposes of this section, the term 'commodities dealer' means any taxpayer who—

"(1) at any time before January 1, 1982, was an individual described in section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle), or

"(2) was a member of the family (within the meaning of section 704(e)(3) of such Code) of an individual described in paragraph (1) to the extent such member engaged in commodities trading through an organization the members of which consisted solely of—

"(A) 1 or more individuals described in paragraph (1), and

"(B) 1 or more members of the families (as so defined) of such individuals.", and

(4) by striking out subsection (h) and inserting in lieu thereof the following:

"(h) Syndicates.—For purposes of this section, any loss incurred by a person (other than a commodities dealer) with respect to an interest in a syndicate (within the meaning of section 1256(e)(3)(B) of the Internal Revenue

Code of 1954) shall not be considered to be a loss incurred in a trade or business."

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

