# United States Tax Court

T.C. Memo. 2024-59

PARKWAY GRAVEL, INC. AND SUBSIDIARIES,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

_____

Docket No. 10819-21.                    Filed May 21, 2024.

_____

*Charles E. Hodges II* and *Thomas M. Zaino*, for petitioner.

*Philip S. Yarberough*, *Jeannine A. Zabrenski*, and *Nicole M. Connelly*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, *Chief Judge*: Respondent determined a deficiency of $1,410,280 and a penalty of $282,056 pursuant to section 6662(a) for 2013. The issues for consideration are whether petitioner engaged in a sham transaction or otherwise assigned income in contravention of the terms of the transaction and must recognize as income $4.2 million received by a related entity pursuant to the transaction, and whether petitioner is liable for a 20% accuracy-related penalty pursuant to section 6662(a).

We incorporate by reference the Stipulations of Facts and their Exhibits. Petitioner's principal place of business has been Delaware during all times relevant to this case, including when it timely filed its Petition.

Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times,

[*2] and Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

*Background of Petitioner and V&N*

In 1948 two cousins, Eugene Greggo and Nicholas Ferrara, Sr., started a road construction company named Greggo & Ferrara, Inc. (Greggo & Ferrara). Six years later they incorporated petitioner, a Delaware sand-and-gravel mining company, which gave the cousins a means to obtain assorted materials necessary for road construction projects.

The sons of Eugene Greggo and Nicholas Ferrara, Sr., Vincent Greggo and Nicholas Ferrara, Jr., respectively, joined their fathers in the business during the 1960s. Vincent Greggo and Nicholas Ferrara, Jr. (Messrs. Greggo and Ferrara), believed that the business should expand into real estate development, and they bought some houses from the company stock (slated for demolition) and developed them for sale in 1968.

Inspired by this effort, Messrs. Greggo and Ferrara entered into a general partnership named V&N in 1972 after Mr. Greggo returned from military service. Messrs. Greggo and Ferrara were the sole partners of the partnership at all relevant times.

Over the next 50 years, Messrs. Greggo and Ferrara did assorted work through V&N, often referred to as the "development arm" of their larger group of companies. V&N developed a mini-storage facility on property that it had purchased from petitioner, receiving rent from the storage units. V&N also owned and rented commercial real estate, including the Parkway Industrial Park. Additionally, V&N received payment for Mr. Ferrara's efforts to help develop a solution to treat waste-water sludge in New Castle County. V&N conducted some of its activities in its own name and some through two wholly owned limited liability companies (LLCs).

*Greggo & Ferrara Group*

Eventually, Messrs. Greggo and Ferrara assumed the ownership and operation of Greggo & Ferrara from their fathers. The partners developed a mutually agreeable division of labor, with Mr. Greggo taking the lead inside the office (focusing on internal administrative

**[*3]** matters) and Mr. Ferrara outside (focusing on negotiations, daily operations, and business development).

Under their leadership, the group of companies grew to 13 entities (informally, the Greggo & Ferrara Group). During 2013 the center of the operation was Greggo & Ferrara, which, according to the notes to its financial statements, was "primarily engaged in the construction of roads, site development, rental of equipment and real estate and the operation of a sand plant." Greggo & Ferrara also served as the primary employer and administrative hub for the group. Specifically, it would assign its employees to the other companies as needed and then bill those companies for the employee time expended on a project-by-project basis.

Petitioner was engaged in the sale of gravel and soil and in real estate investments. It also wholly owned two subsidiaries, including PG Real Estate, Inc., which managed the various real estate holdings of the Greggo & Ferrara Group and received reimbursements from each entity for those services.

The other companies in the Greggo & Ferrara Group were engaged in endeavors including the sale and retail of construction material and equipment (Contractors Material, LLC, and Bear Materials, LLC), hauling of construction materials (Contractors Hauling, LLC), real estate development (4048, LLC, and Galleria, LLC), and landfill management (Cherry Island, LLC). Like PG Real Estate, Inc., all of the related companies would bill (and receive payment from) their sister companies for services rendered. The chief financial officer for Greggo & Ferrara audited the intragroup billings every few years to ensure accuracy. Both Messrs. Greggo's and Ferrara's families were involved in the ownership of the companies within the group.

This separation between petitioner and the other companies in the Greggo & Ferrara Group was not always ironclad. For example, although petitioner focused on sand-and-gravel mining, it also dabbled in real estate development with respect to properties that it owned. Messrs. Greggo and Ferrara kept separate books and records for all the entities in the Greggo & Ferrara Group, including petitioner and V&N, and maintained separate tax return preparers for both.

*The Freeway Pit*

In 1966 petitioner acquired a 58-acre parcel of land on the north side of Christiana Road and the east side of Churchman's Road in New

[*4] Castle, Delaware, commonly referred to as the Freeway Pit. Over the next few decades petitioner used this parcel as a borrow pit to supply material for road construction. After it had outlived its usefulness, materials and waste that had been dumped there were removed and the site was filled in and brought to a grade where the land could be developed.

In 2006 petitioner began exploring the sale of the Freeway Pit. The property was adjacent to the New Castle County Airport and near Wilmington University and at that time was zoned industrial. Petitioner offered to sell the Freeway Pit to both the airport and the university, but neither was interested in the purchase.

Petitioner continued to explore selling the property. In July 2006 petitioner retained a real estate appraiser, who appraised the Freeway Pit at $6.9 million given the then-current industrial zoning.

*Negotiations with Keith Stolz*

Messrs. Greggo and Ferrara began to have discussions with a real estate developer, Keith Stoltz, who was interested in purchasing the property if it could be rezoned. Mr. Stoltz had a checkered reputation in the New Castle community because of certain unpopular real estate developments that he had pursued. As conversations progressed, Mr. Stoltz and Messrs. Greggo and Ferrara understood that Messrs. Greggo and Ferrara would lead efforts to rezone the property.

In a document dated August 15, 2006, petitioner granted to V&N the option to purchase the Freeway Pit for the appraised value of $6.9 million (Option Agreement). This option expired on August 15, 2011, and shifted any gain from a sale above the appraised value from petitioner to V&N.

In a document dated May 17, 2007, petitioner, V&N, and Churchman's Associates, LLC (Churchman), a company owned by Mr. Stoltz, entered into an agreement for the purchase of the Freeway Pit for $17,895,000 (2007 Sale Agreement). The 2007 Sale Agreement allocated $6.9 million of the purchase price to petitioner and the remainder to V&N. This agreement provided for a deposit of $500,000, a due diligence period of 60 days, and a closing date no later than one year and eleven months after the expiration of the due diligence period, although that closing date could be extended.

**[\*5]**   In the 2007 Sale Agreement petitioner, V&N, and Churchman acknowledged that "the preparation and execution of the various agreements and documents which may be required in connection [with various applications] will require the mutual cooperation of the parties." The 2007 Sale Agreement obligated petitioner, V&N, and Churchman to "act reasonably and in good faith in undertaking each of their respective obligations under this Agreement and in cooperating with the other parties in its efforts to do so." Petitioner agreed to support Churchman with respect to applications and other documents necessary for the development of the Freeway Pit as a shopping center or a mixed-use project. Specifically, petitioner further agreed to affirmatively support Churchman's efforts to obtain approval, including by attending public hearings and meetings.

The parties entered into six amendments of the original agreement, which extended the due diligence period and closing dates with an additional deposit of $500,000. The sixth amendment set a closing date of December 5, 2011. Petitioner and V&N also extended the duration of their Option Agreement until August 15, 2016.

*Rezoning Efforts*

Throughout this negotiation process from 2007 to 2012, petitioner, V&N, and Churchman worked to obtain the requisite governmental approvals for rezoning and development of the Freeway Pit. Although there were multiple entities involved, a civil engineering firm retained by Mr. Stoltz, Apex Engineering (Apex), took the lead on the technical requirements, while Mr. Ferrara headed up efforts on the political front.

Mr. Stoltz's rezoning efforts focused on enabling construction of the New Castle Town Center on the Freeway Pit. The New Castle Town Center would serve as a shopping center consisting of 485,000 square feet of retail space with Walmart as an anchor tenant. Mr. Stoltz viewed rezoning the Freeway Pit as essential for the development of the New Castle Town Center.

*Apex*

Apex's work centered around the preparation of the survey and major development plan for the Freeway Pit, which it filed for review in January 2008. This filing launched a multistage review by the New Castle County Planning Board, comprising an exploratory plan review, a preliminary land development plan review, and a record plan review.

[*6] At each step Apex would be required to address concerns presented by Delaware Land Use (DLU) representatives. DLU's ultimate approval and recommendations were necessary before consideration by the New Castle County Council.

During 2007 through 2009 Apex surveyed the property, prepared the development plan for the proposed New Castle Town Center, and worked to address issues including stormwater management, sanitary design, and traffic analysis. Approval from the Delaware Department of Transportation (DelDOT) is required for every major land development plan in Delaware. Apex submitted the preliminary plan for the New Castle Town Center to DelDOT.

In 2010 DLU issued a conditional recommendation in favor of the rezoning request, subject to the resolution of several issues. Apex spent the next two years in technical discussions with DLU, DelDOT, the Delaware River and Bay Authority (DRBA), and the Federal Aviation Administration (FAA) about two principal issues: (1) the construction of roads bordering the airport and on the airport grounds and (2) the height of the proposed development, as some proposed construction would be in the airport's flight path. The latter issue was resolved in June 2011, but the road issue continued to be an obstacle into 2012.

In January 2012 Apex received notice of conditional approval of the development request, contingent on resolving certain issues, including the road issue. Apex thereafter obtained extensions from DLU until August 2012 for recordation of the development plan in order to resolve the outstanding issues with DelDOT, DRBA, and the FAA.

*Mr. Ferrara's Role*

As Apex worked through the technical requirements and approvals, Mr. Ferrara was responsible for political support and authorization. From his and Mr. Greggo's perspectives, rezoning was necessary for the property to be sold above the appraised price. Mr. Ferrara's labors were necessary because of his connections with county councilmen, Mr. Stoltz's unfavorable reputation from prior development in New Castle County, and Apex's lack of expertise in dealing with the political side of a deal.

Mr. Ferrara began his political work in 2006 when he first broached the topic of rezoning with George Smiley, his county councilman. By March 2007 Mr. Smiley was in favor of changing the Freeway Pit's zoning to commercial. In addition to talking to members

[*7] of the New Castle County Council, Mr. Ferrara focused on building support with the public at large. He also negotiated with the Delaware Department of Natural Resources and Environmental Control regarding the status of a creek on the Freeway Pit. And he took an active role with respect to the road work that proved a sticking point with DLU, DelDOT, DRBA, and the FAA.

*Impasse and Resolution of Developing the Freeway Pit*

In 2012 Mr. Stoltz, petitioner, and V&N reached an impasse, and in July Mr. Stoltz walked away from the contemplated purchase of the Freeway Pit. Messrs. Greggo and Ferrara, on behalf of petitioner, engaged Apex to take over from Mr. Stoltz the process for recording the land development plan with New Castle County. Messrs. Greggo and Ferrara agreed to pay Apex $560,000 "to complete the record plan requirements" as was necessary to preserve the previously established commercial regional zoning classification for the Freeway Pit.

In August 2012 Apex obtained the necessary approvals from the State of Delaware Office of the Fire Marshal and the Artesian Water Co., as well as a letter of no objection from DelDOT regarding the entrances and associated roadwork. On August 9, 2012, petitioner (described as the Developer/Owner) entered into a Land Development Improvement Agreement with New Castle County with respect to the Freeway Pit. The New Castle County Council unanimously approved the major development application with commercial zoning on August 21, 2012, and the plan was duly recorded the next day. The recordation meant that all outstanding issues had been resolved and that construction could commence once a building permit had been issued.

In late 2012 Mr. Stoltz returned to the bargaining table, and he, petitioner, and V&N reached an agreement on the purchase of the Freeway Pit. On December 5, 2012, they entered into an agreement of sale for a total purchase price "for the [Freeway Pit]" of $11.1 million, "payable in full . . . to accounts designated by [petitioner] and [V&N]" (2012 Sale Agreement). Mr. Stoltz purchased the Freeway Pit through Churchmans 273, LLC (Churchmans 273), a Delaware LLC. The 2012 Sale Agreement states that it is governed by, and construed according to, Delaware state law.

Mr. Stoltz, petitioner, and V&N structured the 2012 Sale Agreement such that Churchmans 273 paid V&N $4.2 million in exchange for the rights to purchase the Freeway Pit, which V&N held

**[\*8]** pursuant to the Option Agreement. Churchmans 273 then exercised the option rights to purchase the Freeway Pit from petitioner and paid petitioner the option price of $6.9 million.

*2013 Tax Returns, IRS Examination, and Notice of Deficiency*

Petitioner used its portion of the sale proceeds, $6.9 million, to enter into a like-kind exchange under section 1031. The replacement property selected as part of this exchange cost approximately $14 million, and petitioner assumed approximately $7 million in debt as part of that transaction. Petitioner hired Horty & Horty, P.A., to prepare its tax return for 2013. Petitioner timely filed its Form 1120, U.S. Corporation Income Tax Return, for its tax year ending September 30, 2013. Petitioner reported the transaction on Form 8824, Like-Kind Exchanges, attached to its 2013 Form 1120. Through section 1031 petitioner deferred payment of tax on the $6.9 million it received.

V&N hired Kiely & Kiely, P.C., to prepare its tax return for 2012. V&N reported the $4.2 million in sale proceeds as long-term capital gain on its 2012 partnership tax return, and $4.13 million was then distributed to Mr. Greggo and Mr. Ferrara.

The reporting of the Option Agreement in this manner was not the first time petitioner and V&N had reported an option agreement this way. V&N had previously engaged in a similar option agreement (again involving petitioner) regarding the sale of a plot of land. Petitioner used its portion of the proceeds to enter into a like-kind exchange under section 1031, and V&N reported as taxable the sale proceeds it received from the exercise of the option on its 2008 partnership return.

OPINION

I.     *Burden of Proof*

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and taxpayers bear the burden of proving them erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). However, if a taxpayer produces credible evidence with respect to one or more factual issues relevant to the taxpayer's tax liability, the burden of proof may shift to the Commissioner as to that issue or issues. § 7491(a)(1). Likewise, the Commissioner's determination does not receive a presumption of correctness if the determination is shown to be arbitrary and capricious. *Helvering v. Taylor*, 293 U.S. 507, 514 (1935);

**[\*9]** *Cohen v. Commissioner*, 266 F.2d 5, 11 (9th Cir. 1959), *remanding* T.C. Memo. 1957-172.

At trial and in a Motion filed February 22, 2023, petitioner contends that it met the requirements of section 7491 and that the burden, therefore, should shift to respondent. We took the oral Motion under advisement. Because we decide this case on the preponderance of the evidence, the allocation of the burden of proof is immaterial. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340. Accordingly, we will deny the motion.

II.     *Evidentiary Issue*

Respondent filed a Motion in Limine, moving, pursuant to Rules 50 and 143(g) and Rules 401, 402, 403, and 702 of the Federal Rules of Evidence, that the Court exclude the expert witness report of Joyce R. Teis (a.k.a. Joyce Foster) (Teis report) and her testimony. Respondent contends that her expert report does not include the data and exhibits used to summarize or support the opinions set forth in the report in contravention of Rule 143(g) and Rule 702 of the Federal Rules of Evidence. Respondent further avers that any data Ms. Teis relied upon is unreliable and inadmissible. Petitioner disagrees with respondent's contention that Ms. Teis's report fails to comply with Rule 143(g)(1)(B). At trial the Court entered the Teis report into evidence for the limited purposes of reflecting Mr. Greggo's state of mind at the time of the Option Agreement, while reserving the issue of whether it may be considered substantive evidence.

Tax Court proceedings are conducted in accordance with the Federal Rules of Evidence. § 7453; Rule 143(a). Expert testimony is admissible under Rule 702 of the Federal Rules of Evidence if it assists the Court in understanding the evidence or determining a fact in issue. *See, e.g.*, *Sunoco, Inc. & Subs. v. Commissioner*, 118 T.C. 181, 183 (2002). The admissibility of expert witness testimony is within the discretion of the trial judge. Fed. R. Evid. 104; *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 335–36 (2011). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993), the Supreme Court stressed the trial court's role as gatekeeper in excluding evidence that is unreliable or irrelevant.

An expert witness must "prepare a written report for submission to the Court" before trial. Rule 143(g)(1). If the expert is qualified, the report is "received in evidence as the direct testimony of the expert

[*10] witness." Rule 143(g)(2). Rule 143(g)(1) accordingly requires that an expert witness report "shall contain" (among other things) a complete statement of all opinions the witness expresses and the basis and reasons for them, the facts or data considered by the witness in forming her opinions, and any exhibits used to summarize or support her opinions. *Skolnick v. Commissioner*, T.C. Memo. 2019-64, at *6.

Rule 143(g)(2) provides that an expert witness' testimony will be excluded altogether for failure to comply with these provisions, unless the failure is shown to be due to good cause and the failure does not unduly prejudice the opposing party, such as by significantly impairing the opposing party's ability to cross-examine the expert or by denying the opposing party the reasonable opportunity to obtain evidence in rebuttal to the expert witness' testimony. While the factual basis of an expert opinion generally goes to the credibility of the testimony and not its admissibility, an expert's opinion must be sufficiently supported to be admitted. *Klingenberg v. Vulcan Ladder USA, LLC*, 936 F.3d 824, 829–30 (8th Cir. 2019).

Federal courts acknowledge differences between percipient witnesses who happen to be experts and those experts who, without prior knowledge of the facts giving rise to litigation, are recruited to provide expert opinion testimony. *See Downey v. Bob's Disc. Furniture Holdings, Inc.*, 633 F.3d 1, 6 (1st Cir. 2011) (interpreting Federal Rule of Civil Procedure 26(a)(2)(B)). Percipient witnesses who happen to be experts fall outside the requirements of Federal Rule of Civil Procedure 26(a)(2)(B). *Downey*, 633 F.3d at 6; *see Fielden v. CSX Transp., Inc.*, 482 F.3d 866, 869 (6th Cir. 2007). Rule 143(g)(1) is modeled after Federal Rule of Civil Procedure 26(a)(2)(B) and contains identical wording. Furthermore, Rule 1 states that we are to give weight to the Federal Rules of Civil Procedure in instances where there is no applicable Tax Court Rule.

Ms. Teis was a key actor in the occurrences leading to petitioner's signing of the Option Agreement and was not retained for the purpose of offering expert opinion testimony. *See Downey*, 633 F.3d at 6. As Ms. Teis prepared her report in the normal course of her job duties, she is an "actor with regard to the occurrences from which the tapestry of the lawsuit was woven." *Id.* (quoting *Gomez v. Rivera Rodriguez*, 344 F.3d 103, 113 (1st Cir. 2003)). Ms. Teis is therefore a percipient witness.

Petitioner, applying *Downey*, argues that Ms. Teis's status as a percipient witness exempts her report from the requirements of

**[\*11]** Rule 143(g). Rather, we understand *Downey* to hold that percipient witnesses who happen to be experts may render opinions based on their expertise through testimony at trial without submitting an accompanying report. *Downey*, 633 F.3d at 7–8. Petitioner, in contrast, is endeavoring to enter a report prepared by a percipient witness. The U.S. Court of Appeals for the First Circuit's holding in *Downey* does not appear to extend its exemption from Federal Rule of Civil Procedure 26(a)(2)(B) (and by extension, Rule 143(g)) to expert reports submitted by percipient witnesses.

Ms. Teis relied on specialized knowledge in reaching the valuation conclusions expressed in the report. The Teis report was prepared as a paired sales examination and was based on "surveys of market, cost and income data pertinent to this assignment," collected from the State of Delaware, New Castle County, and the Delaware Economic Development Office. This underlying data used in the Teis report was not included in the report itself or as an addendum. To reduce the impact of that omission, petitioner provided a study from Ms. Teis's office detailing different comparable real estate sales that took place around the time that Ms. Teis undertook the Teis report (sales study). At trial, Ms. Teis acknowledged that she did not use any of the comparable sales included in the sales study in creating the Teis report. On cross-examination Ms. Teis was unable to point to the specific data she used or considered in creating the Teis report. When respondent questioned Ms. Teis about specific data she used, Ms. Teis was often unable to answer questions in detail or at all. These gaps in information left respondent unable to examine the foundations of the Teis report as intended by Rule 143(g).

The Teis report fails to comply with the requirements of Rule 143(g). We will therefore grant respondent's Motion in Limine and will not admit the Teis report or the sales study into evidence as an expert report. Furthermore, as the Teis report uses Ms. Teis's specialized knowledge in reaching the valuation conclusions expressed in the report, it may not be admitted into evidence other than as an expert report. *See* Fed. R. Evid. 701. The Teis report remains admitted into evidence solely for purposes other than establishing the truth of the matter asserted and for the limited purposes of reflecting Mr. Greggo's state of mind at the time of the Option Agreement.

[*12] III.   *Validity of the Structure of the Transaction*

Respondent makes various arguments regarding the validity of the Option Agreement and the subsequent 2012 Sale Agreement. With respect to the Option Agreement, respondent argues that it lacks consideration under Delaware law, and is therefore an invalid contract. With respect to the interaction between the Option Agreement and the 2012 Sale Agreement, respondent argues that petitioner disavows the correct form of the transaction, incorrectly assigning to V&N a portion of the proceeds from the sale of the Freeway Pit. With respect to V&N's role in the transaction, respondent argues that V&N served as a mere conduit for the sale of the Freeway Pit, and its proceeds should be imputed to petitioner. Through each argument, respondent argues that the $4.2 million reported by V&N is income to petitioner.

Respondent argues that petitioner did not receive any consideration pursuant to the Option Agreement, and the contract is therefore invalid. In interpreting the terms of a contract, the Court looks to the governing state law. *Belk v. Commissioner*, 140 T.C. 1, 13 n.21 (2013), *aff'd*, 774 F.3d 221 (4th Cir. 2014). The parties to the 2012 Sale Agreement were each Delaware companies, and the 2012 Sale Agreement specifically stated that it was governed by, and construed according to, Delaware state law.

According to Delaware law, "a recital in a written agreement that a stated consideration has been given facially supports a finding that the agreement is supported by consideration, absent facts suggesting that no such consideration was actually given or expected." *Moscowitz v. Theory Ent. LLC*, C.A. No. 2019-0780, 2020 WL 6304899, at *12 (Del. Ch. Oct. 28, 2020); Restatement (Second) of Contracts § 87 cmt. c (Am. L. Inst. 1981); *see also TA Operating LLC v. Comdata, Inc.*, C.A. No. 12954, 2017 WL 3981138, at *23 (Del. Ch. Sept. 11, 2017). "Delaware law does not 'assume[] that parties to a contract must explicitly detail the precise consideration they are exchanging' and 'makes no such requirement,' . . . ." *Moscowitz*, 2020 WL 6304899, at *12 (quoting *Seiden v. Kaneko*, C.A. No. 9861, 2017 WL 1093937, at *6 (Del. Ch. Mar. 22, 2017), *aff'd*, 177 A.3d 69 (Del. 2017) (unpublished table decision)).

Courts have treated recitals of consideration as not only evidence that consideration was exchanged but as a binding promise to pay the nominal amount, for which the promise is itself valid consideration. *See* Restatement (Second) of Contracts § 87(1)(a); 2 *Corbin on Contracts* § 5.17 (2024). Further, courts have invoked the doctrines of promissory

**[\*13]** and equitable estoppel to "save options from the destructive force of the exaggerated impact of consideration doctrine."   2 *Corbin on Contracts* § 5.17.

Respondent argues that the Option Agreement lists the consideration as "Ten Dollars ($10.00) . . . and other good and valuable consideration," but that the amount likely went unpaid.  The meaning inferred from a particular provision, however, cannot control the meaning of the entire agreement if that inference conflicts with the agreement's overall scheme. *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985).  While the Option Agreement, as interpreted under Delaware law, provides evidence of cash consideration, it is not the only consideration provided.  Pursuant to other provisions within the Option Agreement, V&N worked to increase the value and marketability of the Freeway Pit.  Mr. Ferrara, through V&N, lobbied members of the New Castle County Council to support the rezoning of the Freeway Pit, and the County Council ultimately approved the rezoning.  Mr. Ferrara also garnered support from the public at large and conducted negotiations with the Delaware Department of Natural Resources and Environmental Control as well as DLU.

Petitioner, V&N, and Mr. Stoltz viewed these efforts as essential for the sale of the Freeway Pit, serving to increase the value of the property and to improve petitioner's chances of selling it. "[C]onsideration is to be detected if it is present anywhere in the transaction in question, regardless of whether any label was put on it, and regardless of whether it was spelled out in the paper-writing." *Equitable Tr. Co. v. Gallagher*, 99 A.2d 490, 492–93 (Del. 1953).  The Option Agreement and its subsequent amendments were therefore supported by consideration, both explicit and unspoken, and were enforceable against petitioner.

Respondent argues that the 2012 Sale Agreement allocates the full $11.1 million to petitioner in exchange for the Freeway Pit and does not allocate any portion of the sale proceeds to V&N for its option. Respondent further argues that petitioner, having reported $6.9 million of the proceeds while V&N reported $4.2 million, is disavowing the form of its own transaction.  Respondent contends that the $4.2 million paid to V&N was actually earned by and paid to petitioner and should therefore be characterized as an assignment of income, and petitioner should recognize the full $11.1 million as payment for real property it sold. *See Commissioner v. Sunnen*, 333 U.S. 591, 604 (1948) (stating

**[\*14]** that "the mere assignment of the right to receive income is not enough to insulate the assignor from income tax liability" where "the assignor actually earns the income or is otherwise the source of the right to receive and enjoy the income").

Contracts are construed according to the intent of the parties as of the time of entering into the agreement. *See Long v. Commissioner*, 93 T.C. 5, 10 (1989) (first citing *United States v. Lane*, 303 F.2d 1, 4 (5th Cir. 1962); and then citing 17A C.J.S. *Contracts* § 295 (1963)), *aff'd*, 916 F.2d 721 (11th Cir. 1990) (unpublished table decision). The starting point for ascertaining the parties' intent is the contract itself. *See Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011) ("The strongest objective manifestation of intent is the language of the contract."). The contract must be read as a whole and interpreted in context. *See Senior Exec. Benefit Plan Participants v. New Valley Corp. (In re New Valley Corp.)*, 89 F.3d 143, 149–50 (3d Cir. 1996).

The 2012 Sale Agreement did make an allocation of the $11.1 million payment. The pertinent details of that agreement state that the purchase price was to be allocated between petitioner and V&N. The 2012 Sale Agreement stated that V&N, as the optionee of the Option Agreement, would receive $4.2 million from the buyer in exchange for its right to purchase the Freeway Pit, as provided for in the Option Agreement. Churchmans 273 then exercised the option, pursuant to the rights purchased under the 2012 Sale Agreement, and purchased the Freeway Pit for $6.9 million. The terms of the 2012 Sale Agreement are consistent with petitioner's and V&N's treatment of the income, and no evidence indicates that petitioner endeavored to disavow the transaction, nor assign any income.

Respondent cites various cases concerning parties that entered into agreements they subsequently disavowed but who then claimed that the covenants had no basis in reality or that subsequent documents better reflected the parties' intentions. *See Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967), *vacating and remanding* 44 T.C. 549 (1965); *see also G.C. Servs. Corp. v. Commissioner*, 73 T.C. 406, 411 (1979). Respondent contends that petitioner "assigned $4.2 million from the Freeway Pit sale to V&N and must recognize income on that amount." The $4.2 million was paid to V&N pursuant to rights it held under the Option Agreement and was therefore not petitioner's to assign. Petitioner and V&N have consistently complied with the plain reading of the terms of the 2012 Sale Agreement. Petitioner neither assigned income to V&N nor disavowed the terms of the 2012 Sale Agreement.

**[\*15]** Respondent alternatively argues that V&N served as a conduit for the sale of the Freeway Pit and the $4.2 million paid to V&N should be imputed to petitioner through the conduit doctrine (alternatively, the imputed income rule). *See Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945). In *Court Holding*, the Supreme Court established the conduit doctrine by holding that a corporation had to recognize income on a sale of real property that had been transferred to the shareholders through a liquidating dividend and then sold to a third-party buyer after the buyer and the corporation had already reached an oral agreement for the sale. *Id.* at 332–33. The Supreme Court subsequently distinguished *Court Holding*, recognizing as valid a corporate distribution of assets to a shareholder that were subsequently sold to a third party. *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451 (1950). The Court noted that, in *Cumberland*, the corporation initially rejected the offer from the third-party buyer, and the corporation's shareholders decided to pursue the sale by separately negotiating with the prospective buyer. *Id.* at 452–53. In making the distinction, the Supreme Court stated that the corporation in *Court Holding* had "negotiated for sale of its assets and had reached an oral agreement of sale . . . [then] purported to 'call off' the sale at the last minute and distributed the physical properties in kind to the stockholders." *Id.* at 453.

The U.S. Court of Appeals for the Third Circuit, in determining whether the conduit doctrine applies, has looked at more than moments of negotiation, holding that "all steps in the process of earning the profits must be taken into consideration." *Thomas Flexible Coupling Co. v. Commissioner*, 158 F.2d 828, 831 (3d Cir. 1946). The U.S. Court of Appeals for the Fifth Circuit agreed with this, stating:

> We hold that the *sine qua non* of the imputed income rule is a finding that the corporation actively participated in the transaction that produced the income to be imputed. Only if the corporation in fact participated in the sale transaction, by negotiation, prior agreement, postdistribution activities, or *participated* in any other significant manner, could the corporation be charged with earning the income sought to be taxed. Any other result would unfairly charge the corporation with tax liability for a transaction in which it had no involvement or control.

*Hines v. United States*, 477 F.2d 1063, 1069–70 (5th Cir. 1973); *see also Anderson v. Commissioner*, 92 T.C. 138, 165 (1989) (citing *Hines*, 477

**[\*16]** F.2d 1063).  To avoid application of the conduit doctrine, the entity in question must have "participated in the sale transaction, by negotiation, prior agreement, postdistribution activities, or *participated* in any other significant manner." *Hines*, 477 F.2d at 1069–70.

V&N participated in the sale of the Freeway Pit in a significant manner, as established *supra*.  V&N made extensive efforts to rezone the property that ultimately proved essential for its sale.  Respondent points to petitioner's active participation in the sale of the Freeway Pit as evidence that the conduit theory applies.  We agree that its participation was substantial; and as owners of both V&N and petitioner, Messrs. Greggo and Ferrara worked on behalf of both entities in negotiating the sale of the Freeway Pit.  The conduit theory is not a test that weighs participation among involved entities to determine which is a conduit.  Instead, it asks whether the entity alleged to be a conduit participated in the transaction in a "significant manner." *Id.* at 1070.  V&N participated in the sale of the Freeway Pit in a significant manner and is therefore not a conduit.

IV.     *Sham Transaction*

Alternatively, respondent alleges that the Option Agreement is a factual and economic sham and should be disregarded for tax purposes.  The sham transaction doctrine allows the IRS to disregard transactions that have no substance or economic effect. *Gregory v. Helvering*, 293 U.S. 465 (1935).  In applying this doctrine, the Court looks to "objective economic realities" of a transaction, rather than a particular form employed by the parties. *Frank Lyon Co. v. United States*, 435 U.S. 561, 573 (1978).  There are two types of sham transactions: a factual sham and an economic (or legal) sham. *CNT Invs., LLC v. Commissioner*, 144 T.C. 161, 196 (2015).  Factual shams are transactions that either did not occur, did not occur as reported, or were "performed in violation of some of the background assumptions of commercial dealing, for example arms-length dealing at fair market values." *In re CM Holdings, Inc.*, 301 F.3d 96, 108 (3d Cir. 2002) (quoting *Horn v. Commissioner*, 968 F.2d 1229, 1236 n.8 (D.C. Cir. 1992), *rev'g Fox v. Commissioner*, T.C. Memo. 1988-570, *and rev'g Kazi v. Commissioner*, T.C. Memo. 1991-37).  An economic sham is a transaction that did take place but had no independent economic significance aside from its tax implications. *Krumhorn v. Commissioner*, 103 T.C. 29, 46 (1994).  Respondent asserts that the Option Agreement was both an economic sham and a factual sham.

**[\*17]** Respondent raises Messrs. Greggo's and Ferrara's controlling interests in petitioner and V&N, rendering the two entities related parties, as evidence in support of their position. In analyzing whether a transaction is a sham, courts closely scrutinize related-party transactions because "the control element suggests the opportunity to contrive a fictional [transaction]." *Geftman v. Commissioner*, 154 F.3d 61, 68 (3d Cir. 1998) (quoting *United States v. Uneco, Inc.* (*In re Uneco, Inc.*), 532 F.2d 1204, 1207 (8th Cir. 1976)), *rev'g in part, vacating and remanding in part* T.C. Memo. 1996-447; *Invs. Diversified Servs., Inc. v. Commissioner*, 39 T.C. 294, 306 (1962), *aff'd*, 325 F.2d 341 (8th Cir. 1963). A basic criterion in determining whether transactions between related parties should be recognized is whether the consideration is comparable to that which would have been exchanged had the parties been unrelated. *Invs. Diversified Servs.*, 39 T.C. at 306.

The Supreme Court has made clear, however, that an entity carrying on business activities "remains a separate taxable entity" from its owner and should not be disregarded for tax purposes. *Moline Props., Inc. v. Commissioner*, 319 U.S. 436, 438–39 (1943). Petitioner and V&N each have long histories of carrying on separate business activities; their common control does not provide a basis for disregarding the separate status of the business entities and the individuals operating those entities. *See, e.g.*, *Gordy v. Commissioner*, 36 T.C. 855, 859–60 (1961); *Glasgow Vill. Dev. Corp. v. Commissioner*, 36 T.C. 691, 701–02 (1961). Incorporated by the fathers of Messrs. Greggo and Ferrara in 1954, petitioner had been conducting its own business operations for over 50 years at the time of the 2012 Sale Agreement. It operates as a sand-and-gravel mining company, providing raw materials as required by other entities in the Greggo & Ferrara Group. V&N was formed as a partnership in 1972 and had been operating as the real estate "development arm" of Greggo & Ferrara for approximately 40 years at the time of the 2012 Sale Agreement. Despite common ownership, Messrs. Greggo and Ferrara conducted the various business activities through the appropriate entity that engaged in that type of business, and the Option Agreement and the 2012 Sale Agreement continue this pattern of apportioning activities according to the appropriate entity. Absent evidence that Messrs. Greggo and Ferrara treated petitioner and V&N as interchangeable or disregarded entities, we do not see a reason for doing so here.

Factual shams are "transactions" that were never actually undertaken. *Lerman v. Commissioner*, 939 F.2d 44, 48 n.6 (3d Cir. 1991), *aff'g Fox v. Commissioner*, T.C. Memo 1988-570. We have held

[*18] transactions to be factual shams when taxpayers were unable to prove that events leading to losses or deductions ever occurred. *See Julien v. Commissioner*, 82 T.C. 492 (1984) (finding that interest expense on alleged indebtedness incurred to purchase silver bullion was factual sham when no silver was actually purchased). *But see In re CM Holdings, Inc.*, 301 F.3d at 108 (stating that circular netting transactions, where different loans and payments are deemed to occur simultaneously, thereby offsetting each other, are not by definition factual shams).

The Option Agreement is not a factual sham. Petitioner and V&N entered into the agreement in writing on August 15, 2006; it assigned tasks to both parties to the agreement. Specifically, petitioner pledged to support Churchman with respect to applications and other documents necessary for the development of the Freeway Pit. V&N, through the efforts of Mr. Ferrara, used political connections and experience with development in New Castle County to generate support for rezoning efforts and to encourage public support for the development of the Freeway Pit. That the written agreement and the subsequent supporting actions by petitioner and V&N were undertaken shows that the Option Agreement is not a factual sham.

Economic shams or transactions lacking economic substance are transactions that have actually taken place but which have no economic significance beyond expected tax benefits. *Sheldon v. Commissioner*, 94 T.C. 738, 759 (1990). We have explained economic shams as the "expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." *Falsetti v. Commissioner*, 85 T.C. 332, 347 (1985).

Whether transactions lack economic substance "turns on both the 'objective economic substance of the transactions' and the 'subjective business motivation' behind them." *ACM P'ship v. Commissioner*, 157 F.3d 231, 247 (3d Cir. 1998) (quoting *Casebeer v. Commissioner*, 909 F.2d 1360, 1363 (9th Cir. 1990)), *aff'g in part, rev'g in part* T.C. Memo. 1997-115. The Third Circuit has explained that the objective and subjective tests of the sham transaction doctrine "do not constitute discrete prongs of a 'rigid two-step analysis,' but rather represent related factors both of which inform the analysis of whether the transaction had sufficient substance, apart from its tax consequences, to be respected for tax purposes." *Id.* (quoting *Casebeer v. Commissioner*,

19

**[\*19]** 909 F.2d at 1363).[1] Although the Third Circuit has signaled that the objective analysis may be more important than the subjective, the latter analysis remains important. *Id.* at 248 n.31 ("[W]here a transaction objectively affects the taxpayer's net economic position, legal relations, or non-tax business interests, it will not be disregarded merely because it was motivated by tax considerations."). In applying these principles we must view the transactions "as a whole, and each step, from the commencement . . . to the consummation . . . is relevant." *Weller v. Commissioner*, 270 F.2d 294, 297 (3d Cir. 1959), *aff'g* 31 T.C. 33 (1958), *and aff'g Emmons v. Commissioner*, 31 T.C. 26 (1958).

In determining whether a transaction has objective economic substance, courts examine "whether the transaction has any practical economic effects" other than creating tax benefits. *ACM P'ship v. Commissioner*, 157 F.3d at 248 (quoting *Jacobson v. Commissioner*, 915 F.2d 832, 837 (2d Cir. 1990), *rev'g and remanding in part* T.C. Memo. 1988-341). Courts ignore transactions that lack "nontax substance" because they do not "appreciably affect [the taxpayer's] beneficial interest except to reduce his tax." *Knetsch v. United States*, 364 U.S. 361, 366 (1960) (quoting *Gilbert v. Commissioner*, 248 F.2d 399, 411 (2d Cir. 1957) (Hand, J., dissenting), *remanding* T.C. Memo. 1956-137).

Respondent contends that V&N did not pay any consideration in support of the Option Agreement and stood to benefit from the Option Agreement without any risk to itself. Respondent alleges that petitioner did not stand to gain from the transaction but rather signed away any potential future gain from appreciation in the Freeway Pit while continuing to bear the risk of ownership in the property. As already addressed *supra*, we disagree with respondent's position. Petitioner entered into the Option Agreement seeking assistance with the sale of the Freeway Pit, having been unable to sell the property through prior efforts. V&N provided petitioner with nontax benefits by generating

---

[1] We acknowledge that the economic substance doctrine was codified in section 7701(o), effective for transactions entered into after March 30, 2010. *See* Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, § 1409(e)(1), 124 Stat. 1029, 1070. Respondent, however, has not invoked section 7701(o) in this case and has instead pointed us to the approach taken by the U.S. Court of Appeals for the Ninth Circuit in characterizing transactions for tax purposes. Petitioner has similarly focused on the law of the Ninth Circuit, making no argument that section 7701(o) would dictate a different result but instead citing that section in support of the Court of Appeals' approach. *See also Slone v. Commissioner*, 810 F.3d 599, 606 (9th Cir. 2015) (describing section 7701(o) as having "codified a similar approach" to its own), *vacating and remanding* T.C. Memo. 2012-67. Consequently, we address section 7701(o) no further.

[*20] support among the New Castle County Council for the rezoning of the Freeway Pit, negotiating with the Delaware Department of Natural Resources and Environmental Control, and building public support for the changes. These services, each rendered pursuant to the Option Agreement, contributed to the rezoning of the Freeway Pit, a condition viewed as essential for its sale.

We disagree that V&N did not share any risk. V&N worked to support the rezoning changes without any guarantees that the Freeway Pit would sell. V&N likewise had no guarantees that offers on the property would exceed $6.9 million, thereby denying V&N a portion of the proceeds, despite having already rendered services. Though petitioner and V&N ultimately succeeded in obtaining rezoning approval and an offer in excess of $6.9 million, the lack of a guarantee regarding either was a risk for V&N.

Though the test's inquiry into objective aspects looks at the transaction's economic impact for petitioner, it does so in the context and expectation of tax benefits to petitioner. *See, e.g.*, *ACM P'ship v. Commissioner*, 157 F.3d at 248; *see also CNT Invs.*, 144 T.C. at 199. Without venturing too far into speculation regarding petitioner's behavior, we can say that petitioner does not appear to have created any tax benefits by entering into the Option Agreement, despite common control between petitioner and V&N. Petitioner received $6.9 million in proceeds from the sale of the Freeway Pit and shortly thereafter entered into a like-kind exchange under section 1031 enabling petitioner to defer payment of tax on the proceeds. The replacement property petitioner selected for the exchange cost petitioner approximately $14 million, towards which petitioner pledged the $6.9 million in proceeds and assumed approximately $7 million in debt. Respondent does not contest the nature of the section 1031 exchange.

We could assume that petitioner would have allocated the entire $11.1 million of proceeds to the $14 million replacement property had the Option Agreement not been in place. This would result in petitioner's assuming approximately $3 million in debt and deferring recognition of the $11.1 million, but ultimately leaving petitioner with no larger a tax bill for the year in issue than with the Option Agreement in place. Petitioner has succeeded in showing that the Option Agreement meaningfully changed petitioner's economic position.

The other factor of the economic substance inquiry includes an analysis of petitioner's "subjective business motivation." *ACM P'ship v.*

[*21] *Commissioner*, 157 F.3d at 247. "The subjective intent inquiry focuses on whether the taxpayer entered into the transaction intended to serve a useful business purpose . . . ." *Crispin v. Commissioner*, 708 F.3d 507, 515 (3d Cir. 2013), *aff'g* T.C. Memo. 2012-70. The Third Circuit has focused this inquiry on the taxpayer's subjective motivations for entering into the disputed transaction. *Id.* at 514–15. The subjective intent inquiry also focuses on the "correlation of losses to tax needs coupled with a general indifference to, or absence of, economic profits." *Id.* at 515 (quoting *Keeler v. Commissioner*, 243 F.3d 1212, 1218 (10th Cir. 2001), *aff'g Leema Enters., Inc. v. Commissioner*, T.C. Memo. 1998-18).

Shared motives between related parties do not cause a transaction to lack a business purpose. *See Bowater Inc. v. Commissioner*, T.C. Memo. 1995-164, 1995 WL 160698, at *8 (holding that a subsidiary's business purpose justified actions taken by the parent of the consolidated group).

Petitioner's stated business purpose for the Option Contract was to take advantage of the development and rezoning services offered by Mr. Ferrara as a partner of V&N, in order to succeed in selling the Freeway Pit, while also respecting the Greggo & Ferrara Group's longstanding division of business lines among separate entities. Our review of petitioner's reasons for entering into the Option Contract comports with the evidence presented, and we find that petitioner has established that it entered into the Option Contract with the requisite intent and business purpose. Petitioner presented ample evidence of prior business endeavors conducted through various entities in accordance with their business lines. Contractors Material, LLC, and Bear Materials, LLC, engaged in the sale and retail of construction material and equipment; Contractors Hauling, LLC, engaged in the hauling of construction materials; Cherry Island, LLC, engaged in landfill management; petitioner engaged in the sale of gravel and soil, and in real estate investments; and V&N operated as the "development arm" of their larger group of companies. Mr. Ferrara, through V&N, also handled rezoning projects because he had personal relationships with county political actors, as well as subject-matter knowledge. The separate business lines, established over decades, support petitioner's assertion that the various entities conduct different tasks. By entering into the Option Agreement and engaging V&N for real estate development work, an established area of its expertise, petitioner sought to maintain those divisions. Likewise, using V&N for the rezoning work took advantage of Mr. Ferrara's skill and connections in that area.

**[\*22]** Petitioner's and V&N's ultimate success in their endeavor yielded millions in proceeds for each entity, a result that had previously proven elusive.

We conclude that substantial, nontax purposes motivated the Option Agreement and that attainment of that purpose altered the parties' economic positions in a meaningful way and should be respected.

V.      *Conclusion*

Petitioner has shown that it and V&N properly entered into the Option Agreement, receiving $6.9 million and $4.2 million in proceeds, respectively.  As the transaction is valid and there is no deficiency, petitioner is not liable for the penalty pursuant to section 6662(a) for an underpayment due to a substantial understatement of income tax.

We have considered all of petitioner's and respondent's contentions, arguments, requests, and statements.  To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

*Decision will be entered for petitioner.*